AQUILLA WENDELL WHEADON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wheadon
Docket No. 15222-88
United States Tax Court
T.C. Memo 1992-633; 1992 Tax Ct. Memo LEXIS 662; 64 T.C.M. (CCH) 1172; October 27, 1992, Filed *662 Decision will be entered under Rule 155. Aquilla Wendell Wheadon, pro se. For Respondent: Michael W. Bitner
BEGHE
BEGHE
MEMORANDUM OPINION BEGHE, Judge: Respondent determined deficiencies in petitioner's Federal income tax and additions to tax as follows: [1]
Additions to Tax
Year
Deficiency
Sec. 6653(b)
Sec. 6653(b)(1)
Sec. 6653(b)(2)
Sec. 6661
1981
$ 208,297.14
$ 104,148.57
--
--
--
1982
41,263.00
--
[1] $ 23,371.50
50% of interest
$ 10,316
due on $ 41,263
Unless otherwise indicated, all section references are to *663 the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. The questions we must decide are: (1) Whether petitioner had unreported taxable income of $ 281,872 and $ 89,010 for the years 1981 and 1982, respectively; (2) whether respondent properly disallowed petitioner's claim of an investment tax credit of $ 21,374.55 for 1981; (3) whether petitioner is liable for additions to tax for fraud under section 6653(b) for 1981 and section 6653(b)(1) and (2) for 1982; and (4) whether petitioner is liable for additions to tax for substantial understatement of tax under section 6661 for 1982. We answer each of these questions in the affirmative. Background
Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein. Petitioner resided in Duluth, Minnesota, when he filed his original petition, and in Cleveland, Ohio, when he filed his amended petition. During the years at issue, petitioner resided in East St. Louis, Illinois. Petitioner has a legal education and was a practicing attorney during the years at issue. On July 18, 1984, *664 a Federal grand jury in St. Clair County, Illinois, in the Southern District of Illinois, indicted petitioner on one count of conspiring with Robert Jacox, Walter Avant, and James Randle to defraud the U.S. Department of Housing and Urban Development (HUD) during 1981 and 1982. [2] The indictment also charged petitioner with one count of knowingly making a false and fraudulent representation of a material fact to HUD in violation of 18 U.S.C. section 1001, seven counts of receiving a bribe in return for his influence in committing and allowing a fraud on the United States in violation of 18 U.S.C. section 201(c)(2), seven counts of embezzling and converting Federal money to his own use in violation of 18 U.S.C. section 641, and two counts of willfully and knowingly subscribing to false income tax returns in violation of section 7206(1). [3] After a bench trial before Judge William L. Beatty, U.S. District Court for the Southern District of Illinois, petitioner was convicted on all counts except knowingly making a false and fraudulent representation of a material fact to HUD. The facts of that case are *665 set out in detail in Judge Beatty's memorandum dated May 24, 1985. [4] For convenience, we summarize. Petitioner was executive director of the East St. Louis Housing Authority (ESLHA) from late 1979 until July 1982. As a municipal corporation established under Illinois law, ESLHA received HUD money to implement low-income public housing projects. In June 1980, petitioner, as executive director of ESLHA, conceived and submitted to HUD an innovative proposal to convert two of the Orr Weathers buildings into a low income housing project. On November 5, 1980, HUD approved the project and allocated $ 2,517,000 for the project. In early 1981, petitioner and Booker Ford negotiated the terms of petitioner's participation *666 in a restaurant that Mr. Ford wanted to open in St. Louis, Missouri. Mr. Ford had previously begun negotiating with James Dwyer to lease a building in St. Louis that Mr. Ford wanted to renovate for use as the restaurant. On March 2, 1981, petitioner and Mr. Ford executed a partnership agreement in which petitioner agreed to provide the capital and Mr. Ford agreed to provide the managerial and operating experience for the restaurant. Soon thereafter, petitioner, Mr. Ford, and Mr. Dwyer signed a commercial lease for the restaurant building in St. Louis. Petitioner unsuccessfully tried to obtain a commercial loan to finance the renovation and opening of the restaurant. Unable to obtain the necessary funds by lawful means, petitioner decided to obtain the funds unlawfully by exploiting his position as executive director of ESLHA. In aid of his scheme to do so, petitioner met with Robert Jacox and offered to award the large construction contract for the Orr Weathers project to the Franklin Construction Co. (FCC), Mr. Jacox's construction company, if Mr. Jacox would agree to give petitioner the money needed to renovate and open the restaurant. Petitioner also promised Mr. Jacox "some *667 return on the money" after the restaurant opened. Mr. Jacox agreed to petitioner's proposal and in April 1981, ESLHA awarded the Orr Weathers project contract to FCC. In June 1981, petitioner instructed Mr. Jacox to hire the Phoenix Construction and Management Co. (Phoenix) to oversee the work on the Orr Weathers project. Walter Avant was the Phoenix partner assigned to the Orr Weathers project. Beginning in May 1981, either Mr. Jacox or Mr. Avant would periodically prepare and submit to ESLHA requests for reimbursement for work allegedly done on the Orr Weathers project by FCC. On each occasion, James Randle, the architect whose firm had been hired by ESLHA to design the project and inspect the construction progress, would authorize his secretary or some other person to certify the payment request, although Mr. Randle would not actually inspect the construction site. Thereafter, petitioner would authorize payment and ESLHA would issue a check to FCC. Mr. Jacox would use part of each payment to purchase a cashier's check payable to petitioner or the restaurant partnership. On petitioner's instructions, the SMS Construction Co. (SMS), a purported partnership of petitioner *668 and Mr. Jacox, was the named remitter of most of these checks. Mr. Jacox or his secretary would give the cashier's checks to petitioner, who would deposit the check into the Ford-Wheadon partnership's bank account. This arrangement ended in July 1982, when the ESLHA board of commissioners fired petitioner. From May 1981 to July 1982, petitioner received 21 cashier's checks totaling $ 375,880.18 [5] from Mr. Jacox. In October 1981, petitioner hired Early Wilson, a certified public accountant, to prepare a financial statement for the Ford-Wheadon partnership. Petitioner provided Mr. Wilson with Ford-Wheadon partnership documents, and he told Mr. Wilson that he was acquiring money from "friends" to finance *669 the partnership. At petitioner's request, Mr. Wilson prepared a second financial statement in December 1981 and a 1981 Form 1065 partnership income tax return and Schedule K-1 in April 1982. On August 30, 1982, Mr. Randle inspected the Orr Weathers project for the first time and determined that the value of the completed work on the project was approximately $ 250,000. In 1984, the Orr Weathers project was inspected by Fred Spinti, a cost analyst for HUD. Mr. Spinti determined that the value of the completed work on the project was approximately $ 135,000. After his convictions, petitioner was sentenced, pursuant to an amended order of January 10, 1986, to 7 years' imprisonment on his conviction for conspiracy to defraud HUD in violation of 18 U.S.C. section 286 and on each of the seven convictions for bribery in violation of 18 U.S.C. section 201(c)(2), each sentence to run concurrently with the others. Petitioner also was sentenced to 7 years' imprisonment on each of the seven convictions for embezzlement in violation of 18 U.S.C. section 641 and to 1 year's imprisonment on each of the two convictions *670 for willfully and knowingly subscribing to false income tax returns in violation of section 7206(1), each sentence to run concurrently with the others and with petitioner's sentences for his conspiracy and bribery convictions. On July 15, 1986, the U.S. Court of Appeals for the Seventh Circuit affirmed petitioner's conviction and sentence, as amended. United States v. Wheadon, 794 F.2d 1277 (7th Cir. 1986). Petitioner was incarcerated in a Federal penitentiary in Duluth, Minnesota until late 1989, when he was relocated to a halfway house in Cleveland, Ohio. Petitioner and Mrs. Wheadon's 1981 joint income tax return reported "total income" of $ 103,614.17, "taxable income" of $ 91,793.88, and "total tax" of $ 15,681.83. Attached to this return is a Schedule K-1 for Form 1065 prepared for the Ford-Wheadon partnership showing petitioner as having made a capital contribution of $ 376,111 during 1981. [6] While petitioner is the partner named on this Schedule K-1, "partnership" was the response provided to the question "What type of entity is this partner?" on this schedule. Petitioner and Mrs. Wheadon's 1982 joint income tax return reported "total income" *671 of $ 49,828.28, "taxable income" of $ 29,578.41, and "total tax" of $ 5,480. Respondent is a party in privity with the United States of America, the prosecuting party in petitioner's criminal case. Discussion
Unreported Income
Petitioner contends that respondent erred in determining that he had unreported income for 1981 and 1982. Petitioner has tried to resurrect in this Court an argument he made in his criminal case that the District Court rejected: that Mr. Jacox had an interest in the Ford-Wheadon partnership and that funds petitioner received from Mr. Jacox were Mr. Jacox's capital contributions through SMS to the Ford-Wheadon partnership. [7] Petitioner also argues, citing Commissioner v. Wilcox, 327 U.S. 404 (1946), that the embezzled *672 funds were not income to him because he was always obligated to return these funds to HUD. [8]
Respondent contends that petitioner understated his 1981 and 1982 taxable income on his Federal income tax returns by *673 $ 281,872 and $ 89,010, respectively. Respondent argues that petitioner, by reason of his criminal convictions, is collaterally estopped from denying that he has unreported income for 1981 and 1982. A. Use of Collateral Estoppel
The doctrine of collateral estoppel is intended to promote judicial economy and to protect litigants from the burden of repetitious litigation. Meier v. Commissioner, 91 T.C. 273, 282 (1988); see also Commissioner v. Sunnen, 333 U.S. 591, 598-599 (1948). Under the doctrine of collateral estoppel, a decision on the merits in an action precludes a party to that action, or his privies, from future litigation of any issue actually litigated and necessary to the outcome of that suit. Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 (1979); Meier v. Commissioner, supra at 282. Collateral estoppel applies to issues of fact, whether evidentiary or ultimate, and to issues of law. Commissioner v. Sunnen, supra at 591; Meier v. Commissioner, supra at 286. *674 Petitioner was convicted of conspiracy to defraud HUD, receiving a bribe in return for his influence in committing and allowing a fraud on the United States, embezzling and converting Federal money to his own use, and willfully and knowingly subscribing to false income tax returns for the years 1981 and 1982. Under section 7206(1), [9] a conviction for willfully and knowingly subscribing to a false income tax return requires a finding that the defendant subscribed to a tax return, under the penalty of perjury, on which he willfully and knowingly made a material misstatement. A conviction for embezzling, stealing, or converting Federal money requires proof that the defendant embezzled, stole, or converted money belonging to the United States to his own use or the use of another and that he did so knowingly with the intent to deprive the owner of the use or benefit of the money so taken. 18 U.S.C. sec. 641. [10] Any sentence for a conviction under 18 U.S.C. section 641 is restricted to a fine of not more than $ 1,000 or imprisonment for not more than 1 year, or both unless the value of the property embezzled, stolen, or converted *675 exceeds the sum of $ 100. *676 Judge Beatty, as trier of fact in petitioner's criminal case, found that petitioner received income from the money he embezzled from HUD during 1981 and 1982. See Appendix B, infra p. 45. Judge Beatty also found that petitioner willfully and knowingly understated his income, by not reporting the embezzled money on his 1981 and 1982 Federal income tax returns. [11] See Appendix B, infra pp. 44-45. These understatements were material, and Judge Beatty found no other material misstatements on petitioner's 1981 and 1982 income tax returns. In the absence of any other material misstatement, it was necessary to petitioner's convictions that the District Court find that the embezzled money was income to petitioner and that he understated his income on his 1981 and 1982 income tax returns. Accordingly, petitioner is collaterally estopped from denying that he had income from the embezzled money and that he understated his income on his 1981 and 1982 income tax returns. *677 The District Court found that petitioner embezzled and converted to his own use HUD funds totaling $ 281,871.50 and $ 94,008.68 during 1981 and 1982, respectively. While petitioner's conviction for embezzlement under 18 U.S.C. section 641 only required proof that he embezzled a thing of value belonging to the United States, any sentence of imprisonment for more than 1 year required proof that the value embezzled exceeded $ 100. Petitioner was convicted on seven counts of embezzlement under 18 U.S.C. section 641 and sentenced to 7 years' imprisonment on each count, all sentences to run concurrently. In view of these sentences, it was necessary that the District Court find that petitioner embezzled and converted to his own use over $ 100 on each of the seven occasions, two in 1981 and five in 1982, for which he was charged. Petitioner is therefore collaterally estopped from denying that he received income from his embezzlement activities of, at least, $ 200 and $ 500 during 1981 and 1982, respectively. Notwithstanding the above, petitioner is not collaterally estopped from disputing the total amounts he embezzled from HUD and *678 the income he received therefrom. Neither petitioner's convictions nor the sentences he received as a result of those convictions required the District Court to determine how much, in excess of $ 100, petitioner embezzled and received as income. Because it was not necessary for the District Court to determine exactly how much petitioner embezzled and received as income, the findings of the District Court do not preclude petitioner from disputing the amounts he embezzled and received as income. Cf. Cipparone v. Commissioner, T.C. Memo. 1985-234. However, the District Court's findings are credible evidence of those amounts. Id.
B. Correctness of Respondent's Deficiency Determinations
As stated above, the doctrine of collateral estoppel does not preclude petitioner from disputing the amount of unreported income he received in 1981 and 1982. However, respondent's determination is presumptively correct, and petitioner bears the burden of proving it to be erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Petitioner does not dispute that he received money from Mr. Jacox or that the amount received *679 was different from that determined by respondent. Instead, petitioner's efforts, at trial and on brief, were focused on attempting to convince us that this money was not income to him. As previously stated, petitioner is collaterally estopped from denying this fact. Moreover, even if we were to assume that petitioner was not collaterally estopped from denying that he had income from the money he received from Mr. Jacox, the findings of the District Court are highly persuasive evidence that this money was income to petitioner, and petitioner has failed to rebut this evidence. Cf. Cipparone v. Commissioner, supra. After a bench trial in which petitioner argued that funds he received from Mr. Jacox were Mr. Jacox's capital contributions to the Ford-Wheadon partnership, the District Court found otherwise. The District Court found that Mr. Jacox did not have any interestin the Ford-Wheadon partnership until sometime in or after July 1982. See Appendix B, infra pp. 41, 45. The District Court also found that petitioner embezzled and converted HUD money to his own use and that this money was income to him. See Appendix B, infra pp. 44-45. *680 While petitioner argues that the District Court erred in making these findings, his testimony to this effect was uncorroborated and not credible. Under these circumstances, even if petitioner should not be collaterally estopped from trying to convince us that the money was not income to him, we are not persuaded by his testimony. Cf. Grosshandler v. Commissioner, 75 T.C. 1, 16 (1980). Petitioner does not otherwise dispute respondent's deficiency determinations. Petitioner has therefore failed to persuade us that respondent erred in determining the amount of petitioner's unreported income for 1981 and 1982. We accordingly sustain respondent's determinations. Investment Credit
Petitioner contends that he is entitled to a 1981 investment tax credit of $ 21,374.55, his allocable share of SMS's 1981 investment credit of $ 79,165. Petitioner argues that SMS had a qualified investment of $ 195,525 in new investment credit property acquired and placed in service during 1981. Petitioner argues that this credit arose from leasehold improvements that SMS made to the Ford-Wheadon partnership's restaurant property, Petitioner also argues that SMS *681 incurred qualified rehabilitation expenses of $ 317,931 for buildings that had been in service for at least 30 years. Respondent contends that petitioner has not substantiated that he is entitled to the claimed investment tax credit. Respondent argues that petitioner has not established (1) that the property qualifies for an investment tax credit, (2) that petitioner is entitled to any investment tax credit with respect to such property, and (3) that the property was placed in service during 1981. In the alternative, respondent argues that petitioner is required to recapture the credit on his 1982 return because the lease terminated in or around December 1982. Respondent's determination is presumptively correct, and petitioner bears the burden of proving that he is entitled to the investment tax credit. Rule 142(a); Uecker v. Commissioner, 81 T.C. 983, 998 (1983). Petitioner did not offer any credible testimony substantiating his claim to the investment tax credit. While petitioner argues that various leases, bills of sale, and other business records would have substantiated his claim to the investment tax credit, petitioner failed to introduce *682 any of those items into evidence. Even if we were inclined to accept petitioner's claim that his failure to provide respondent's Appeals Officer with evidence to substantiate his claim to the investment tax credit was caused by his incarceration in the Federal penitentiary in Duluth, Minnesota, petitioner's relocation to a halfway house in Cleveland approximately 2 years prior to trial gave him ample opportunity to prepare for trial and to retrieve any relevant documents. [12]
*683 Moreover, petitioner's argument that SMS had an interest in the leasehold improvements of the Ford-Wheadon partnership is uncorroborated and contrary to the District Court's finding that "SMS was a mere subterfuge to transfer [ESL]HA monies from Jacox to * * * [petitioner]." See Appendix B, infra p. 42. The District Court also found that the restaurant opened on July 4, 1982. See Appendix B, infra p. 40. Absent highly credible evidence to rebut these findings, we are not persuaded that SMS had any interest in any leasehold improvements made to the Ford-Wheadon restaurant property or that the investment credit property was placed in service during 1981. Petitioner's invitation to respondent's agent that she "could visit the building and inspect the building and equipment herself" to substantiate petitioner's claim is not an acceptable substitute for credible evidence. The burden of proof is on petitioner, and he cannot unilaterally delegate his burden to respondent. On this record, petitioner has not shown that the reported expenditures were made or that the property was placed in service during 1981. Accordingly, respondent's determination is sustained, and we need *684 not consider whether the property satisfied the statutory requirements for investment credit property and, if so, whether petitioner would be entitled to the investment tax credit, or address respondent's alternative argument regarding recapture of the credit in 1982. Section 6653(b) Additions
Respondent also determined that petitioner is liable for additions to tax for fraud under section 6653(b) for 1981 and section 6653(b)(1) and (2) for 1982. [13] That determination poses a factual question that we decide after reviewing the entire record. King's Court Mobile Home Park, Inc. v. Commissioner, 98 T.C. 511, 516 (1992); Recklitis v. Commissioner, 91 T.C. 874, 909 (1988). Respondent bears the burden of proof on this issue. Sec. 7454(a); Rule 142(b); Parks v. Commissioner, 94 T.C. 654, 660 (1990). To meet this burden, respondent must show, by clear and convincing evidence, that petitioner underpaid taxes for 1981 and 1982, and that some part of the underpayment is due to fraud. Sec. 7454(a); Rule 142(b); Parks v. Commissioner, supra at 660. *685 The first prong of the fraud test requires that respondent affirmatively prove that petitioner underpaid his taxes for the years at issue. Respondent generally carries this burden by showing through clear and convincing evidence that the taxpayer underreported his gross receipts and that the taxpayer has failed to come forward with probative evidence of deductions, exclusions, or credits that respondent has not already allowed. United States v. Bender, 218 F.2d 869 (7th Cir. 1955); Rivera v. Commissioner, T.C. Memo. 1979-343. However, in Parks v. Commissioner, supra at 660-661, this Court stated: Where, as here, respondent has prevailed on the issue of the existence of a deficiency by virtue of a taxpayer's failure to carry his burden of proof, respondent cannot rely on that failure to sustain his burden of proving fraud. We must be careful in such cases not to bootstrap a finding of fraud upon a taxpayer's failure to prove respondent's deficiency determination erroneous. * * * [Citations omitted.] That admonition is pertinent here, and we bear it in mind in reaching our decision *686 in this case. HUD funds received by petitioner from Mr. Jacox during 1981 and 1982 were income to petitioner, and petitioner failed to report this income on his income tax returns for those years. See discussion supra pp. 9-14. Petitioner has not provided any credible evidence that he is entitled to any deductions, credits, or exclusions that were not already claimed and allowed. Nor is this that kind of exceptional case in which there is such likelihood that there were such deductions, as would make it appropriate to shift to respondent the burden of coming forward with evidence that there were no such deductions. See Rivera v. Commissioner, supra.Accordingly, respondent has shown, by clear and convincing evidence, that petitioner underpaid his taxes for 1981 and 1982. The "due to fraud" language of section 6653(b) requires proof of a specific intent on the part of the taxpayer to evade a tax believed to be owing, by conduct intended to conceal, mislead, or otherwise prevent the collection of such tax. Wright v. Commissioner, 84 T.C. 636, 639 (1985); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). *687 Fraudulent intent will not be imputed or presumed, and mere suspicion does not prove fraud. Shaw v. Commissioner, 27 T.C. 561, 569-570 (1956), affd. 252 F.2d 681 (6th Cir. 1958). However, fraudulent intent may be proved by circumstantial evidence because direct proof is seldom available. Niedringhaus v. Commissioner, 99 T.C.    ,     (1992) (slip. op. at 14); Rowlee v. Commissioner, supra at 1123. Over the years, a nonexclusive list of the various kinds of circumstantial evidence that may support a finding of fraudulent intent has been developed. These "badges of fraud" include: (1) A pattern of understatement of income; (2) inadequate books and records; (3) failure to file tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealment of assets; (6) failure to cooperate with tax authorities; (7) filing false Forms W-4; (8) failure to make estimated tax payments; (9) dealing in cash; (10) engaging in illegal activity; and (11) attempting to conceal illegal activity. Niedringhaus v. Commissioner, supra at     (slip. op. at 14) (citing Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), *688 affg. T.C. Memo. 1984-601). The taxpayer's education and sophistication are also relevant to the determination of fraud. Francis v. Commissioner, T.C. Memo. 1992-462; see also Halle v. Commissioner, 175 F.2d 500, 503 (2d Cir. 1949), affg. 7 T.C. 245 (1946). A conviction for willfully and knowingly subscribing to a false income tax return under section 7206(1) does not estop the taxpayer from denying fraud. Wright v. Commissioner, supra at 643. However, a conviction under section 7206(1) is evidence of a fraudulent intent to evade taxes. Id. at 643-644. Respondent contends that the findings of the District Court in petitioner's criminal case, coupled with petitioner's high levels of education and sophistication, are clear and convincing evidence of petitioner's fraudulent intent to evade taxes. Conversely, petitioner contends that respondent has failed to meet her burden of proof on the fraud issue. For the reasons that follow, we agree with respondent. Petitioner willfully and knowingly understated *689 his income on his 1981 and 1982 income tax returns. The evidence before us, namely the District Court's findings of fact, clearly reveals that these understatements were substantial. While these understatements of income, standing alone, are not enough to show fraudulent intent, Webb v. Commissioner, 394 F.2d 366, 379 (5th Cir. 1968), the consistent and substantial understatement of income is highly persuasive evidence of an intention to evade taxes. Adler v. Commissioner, 422 F.2d 63, 66 (6th Cir. 1970); Kashat v. Commissioner, 229 F.2d 282, 285 (6th Cir. 1956), revg. in part and remanding a Memorandum Opinion of this Court dated March 29, 1954. However, we do not base our finding of fraud solely on petitioner's failure to report substantial income. The record in this case is replete with other indicia of fraud. The income that petitioner omitted from his income tax returns resulted from his conception of and participation in a sophisticated scheme to embezzle HUD funds. When petitioner used these embezzled funds to finance the Ford-Wheadon partnership, he concealed this fact from *690 his accountant. Participation in an illegal activity and the concealment of the resulting income from his return preparer is an indication that petitioner intended to evade taxes. Bradford v. Commissioner, supra at 307; Foster v. Commissioner, T.C. Memo. 1989-276. Additionally, petitioner characterized the funds as something other than income to him, thereby trying to conceal his illegal activity and assets he received as a result of that activity. See Foster v. Commissioner, supra.
Petitioner has a legal education and was a practicing attorney during the years at issue. Both his innovative conception of converting the Orr Weathers buildings to a public housing project and his elaborate scheme to conceal the money he stole and his resulting income demonstrate petitioner's high levels of intelligence and sophistication. He obviously understood and fully appreciated his legal obligations to report all income, legal and illegal, and to pay taxes on that income. In summary, petitioner's substantial understatements of income over a 2-year period, his participation in an illegal activity, *691 his acts of concealment, and his legal education and overall sophistication are clear and convincing evidence of his fraudulent intent to evade taxes. We accordingly hold petitioner liable for the additions to tax under section 6653(b) for 1981 and section 6653(b)(1) and (2) for 1982. Section 6661 Additions
Section 6661 provides for an addition to tax equal to 25 percent of any underpayment of tax attributable to a substantial understatement. An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). The understatement will be reduced to the extent that it is attributable to: (1) The taxpayer's treatment of an item for which there is or was substantial authority; or (2) any item for which the relevant facts were disclosed on the return or in a statement attached to the return. Sec. 6661(b)(2)(B). Petitioner bears the burden of proof on this issue. Rule 142(a); King's Court Mobile Home Park, Inc. v. Commissioner, 98 T.C. 511, 517 (1992). Although petitioner challenges the "total deficiency" and "total additions to tax" in his amended petition, he *692 did not raise any argument or introduce any evidence bearing on his liability for additions to tax under section 6661. Petitioner advanced no substantial authority for his failure to report the income in question, nor did he make any disclosure respecting that income on his return. Consequently, petitioner has not met his burden of proof and respondent's determination is sustained. Because of a possible mathematical error in respondent's determination of the additions to tax, Decision will be entered under Rule 155. APPENDIX A On July 18, 1984, a Federal grand jury in St. Clair County, Illinois, in the Southern District of Illinois, made the following charges: COUNT 1
1. From in or about March, 1981, and continuing thereafter up to and including in or about July, 1982, the exact dates being unknown to the Grand Jury, in St. Clair County, within the Southern District of Illinois and elsewhere, A. WENDELL WHEADON, ROBERT F. JACOX, and WALTER AVANT did enter into an agreement and conspiracy, along with unindicted co-conspirator James G. Randle, to defraud the United States Department of Housing and Urban Development (hereafter HUD) by obtaining and aiding in the obtaining *693 of false and fraudulent claims. 2. It was a part of the conspiracy that the East St. Louis Housing Authority (hereafter HA) would and did receive monies from HUD for the renovation and modernization of the low income public housing project known as the Orr Weathers Buildings E-3 and E-4. 3. It was a further part of the conspiracy that A. WENDELL WHEADON was Executive Director of the HA, and in such capacity was responsible for the disbursement of funds for the construction and renovation of low income housing projects financed by HUD in the East St. Louis, Illinois area. 4. It was further part of the conspiracy that ROBERT F. JACOX was the owner of Franklin Construction Company (hereafter FCC), a construction company located in East St. Louis, Illinois. 5. It was a further part of the conspiracy that WALTER AVANT was a partner in the Phoenix Construction and Management Company (hereafter PCMC), a company located in East St. Louis, Illinois. 6. It was a further part of the conspiracy that JAMES G. RANDLE was the owner of J.G. Randle & Associates, an architectural firm with offices in both East St. Louis, Illinois and St. Louis, Missouri. 7. It was a further part of the *694 conspiracy in May, 1981, [that] FCC was awarded a $ 2,254,300.00 contract by the HA, which contract was funded by the HUD Low Income Public Housing Modernization Program and called for renovation of the Orr Weathers Buildings E-3 and E-4 (hereafter Orr Weathers contract). 8. It was a further part of the conspiracy that PCMC did contract with FCC to be the construction manager on the Orr Weathers contract at the rate of $ 2,500.00 per week. 9. It was a further part of the conspiracy that J.G. Randle and Associates was under contract with the HA for $ 157,122.00 to prepare the preliminary and final drawings and specifications, and to inspect the performance of construction work on the Orr Weathers construction contract. 10. It was a further part of the conspiracy that ROBERT F. JACOX and WALTER AVANT would and did prepare A.I.A. Request for Payment documents, which documents allegedly reflected work and labor performed and materials purchased on the Orr Weathers contract, but in fact stated figures and amounts that were false and fraudulent, in that the work was not performed. 11. It was a further part of the conspiracy that James G. Randle would and did certify on these A.I.A. *695 Request for Payment documents that the work, as represented by the amounts of money stated, had been performed in accordance with the drawings and specifications, when, in fact, he knew that the work on the Orr Weathers contract had not been inspected and had not been performed. 12. It was a further part of the conspiracy that A. WENDELL WHEADON did have a financial interest in a private business in St. Louis, Missouri, called Mr. Ford's Lounge and Restaurant, which business required money to renovate. 13. It was a further part of the conspiracy that A. WENDELL WHEADON would and did solicit, seek, ask and demand money from ROBERT F. JACOX to renovate Mr. Ford's Restaurant and Lounge, and, knowing that ROBERT F. JACOX did need money to pay him, did approve the A.I.A. Request for Payment documents thereby authorizing the HA to disburse HUD monies to FCC on the Orr Weathers contract, when, in fact, he knew that the amounts of money requested on the A.I.A. documents were false and fraudulent. 14. It was a further part of the conspiracy that ROBERT F. JACOX did agree to and, in fact, did pay the money solicited and demanded by A. WENDELL WHEADON, as well as the $ 2,500.00 per week *696 to PCMC. 15. It was a further part of the conspiracy that FCC would not and did not furnish a performance and payment bond to renovate and modernize the Orr Weathers Buildings E-3 and E-4. 16. It was a further part of the conspiracy that A. WENDELL WHEADON, ROBERT F. JACOX, WALTER AVANT and James G. Randle did enter into this agreement and conspiracy to defraud HUD by obtaining false and fraudulent claims which resulted in the HA disbursing approximately $ 1,400,000.00 in HUD monies to FCC on the Orr Weathers contract when, in fact, only approximately $ 150,000.00 of work had been performed on the contract. 15.[sic] In furtherance of this conspiracy and agreement, to and accomplish its purposes and objectives, the following overt acts were committed: OVERT ACTS
(a) On or about July 14, 1981, in East St. Louis, Illinois, A. WENDELL WHEADON and ROBERT F. JACOX had a conversation. (b) On or about September [sic], 1981, in East St. Louis, Illinois, ROBERT F. JACOX and WALTER AVANT had a conversation. (c) On or about May 14, 1982, in East St. Louis, Illinois, ROBERT F. JACOX and WALTER AVANT had a conversation. (d) On or about May 17, 1982, in East St. Louis, Illinois, A. *697 WENDELL WHEADON and ROBERT F. JACOX had a conversation. (e) On or about May 24, 1982, in East St. Louis, Illinois, A. WENDELL WHEADON and ROBERT F. JACOX had a conversation. (f) On or about June 3, 1982, in East St. Louis, Illinois, A. WENDELL WHEADON and ROBERT F. JACOX had a conversation. (g) On or about June 8,,[sic] 1982, in East St. Louis, Illinois, A. WENDELL WHEADON and ROBERT F. JACOX had a conversation. (h) On or about June 14, 1982, in East St. Louis, Illinois, A. WENDELL WHEADON and ROBERT F. JACOX had a conversation. All in violation of Title 18, United States Code, Section 286. COUNT 2
On or about May 29, 1981, in St. Clair County, within the Southern District of Illinois, A. WENDELL WHEADON did knowingly and willfully make a false and fraudulent representation in a matter within the jurisdiction of a department of the United States, as to a material fact with the knowledge that such representation contained a false and fraudulent statement; that is, he did falsely and fraudulently certify to the United States Department of Housing and Urban Development on HUD Form 5402, Requisition for Funds, which requested $ 1,492,000.00 for the Low Income Public Housing *698 Modernization Project, Ill. 1-903, to renovate the Orr Weathers Buildings E-3 and E-4, that all applicable provisions of the contract between the East St. Louis Housing and Franklin Construction Company had been complied with in accordance with HUD regulations, whereas he there and then knew that Franklin Construction Company had not and did not furnish a performance and payment bond with [sic] prior to or after the execution by the Housing Authority of a contract with the Franklin Construction Company in the amount of $ 2,254,300.00, to renovate Orr Weathers E-3 and E-4, in violation of Title 18, United States Code, Section 1001. COUNT 3
On or about July 16, 1981, in St. Clair County, within the Southern District of Illinois and elsewhere, A. WENDELL WHEADON, in the capacity of Executive Director of the East St. Louis, Illinois Housing Authority, corruptly did, directly and indirectly, ask, demand, solicit, seek, accept, and receive from ROBERT F. JACOX, owner of Franklin Construction Company, $ 41,000.00 in return for A. WENDELL WHEADON being influenced in committing and allowing a fraud on the United States by approving the payment of $ 236,974.50 in monies of the United *699 States Department of Housing and Urban Development to Franklin Construction Company for construction work allegedly performed on the Orr Weathers Buildings E-3 and E-4, when, in fact, A. WENDELL WHEADON knew that such work had not been performed; all in violation of Title 18, United States Code, Sections [sic] 201(c)(2). COUNT 4
On or about July 28, 1981, in St. Clair County, within the Southern District of Illinois and elsewhere, A. WENDELL WHEADON, in the capacity of Executive Director of the East St. Louis, Illinois Housing Authority, corruptly did, directly and indirectly, ask, demand, solicit, seek, accept, and receive from ROBERT F. JACOX, owner of Franklin Construction Company, $ 30,000.00 in return for A. WENDELL WHEADON being influenced in committing and allowing a fraud on the United States by approving the payment of $ 236,974.50 in monies of the United States Department of Housing and Urban Development to Franklin Construction Company for construction work allegedly performed on the Orr Weathers Buildings E-3 and E-4, when, in fact, A. WENDELL WHEADON knew that such work had not been performed; all in violation of Title 18, United States Code, Sections [sic] 201(c)(2). *700 COUNT 5
On or about May 17, 1982, in St. Clair County, within the Southern District of Illinois and elsewhere, A. WENDELL WHEADON, in the capacity of Executive Director of the East St. Louis, Illinois Housing Authority, corruptly did, directly and indirectly, ask, demand, solicit, seek, accept, and receive from ROBERT F. JACOX, owner of Franklin Construction Company, $ 10,000.00 in return for A. WENDELL WHEADON being influenced in committing and allowing a fraud on the United States by approving the payment of $ 16,600.00 in monies of the United States Department of Housing and Urban Development to Franklin Construction Company for construction work allegedly performed on the Orr Weathers Buildings E-3 and E-4, when, in fact, A. WENDELL WHEADON knew that such work had not been performed; all in violation of Title 18, United States Code, Sections [sic] 201(c)(2). COUNT 6
On or about May 24, 1982, in St. Clair County, within the Southern District of Illinois and elsewhere, A. WENDELL WHEADON, in the capacity of Executive Director of the East St. Louis, Illinois Housing Authority, corruptly did, directly and indirectly, ask, demand, solicit, seek, accept, and receive from *701 ROBERT F. JACOX, owner of Franklin Construction Company, $ 10,000.00 in return for A. WENDELL WHEADON being influenced in committing and allowing a fraud on the United States by approving the payment of $ 10,000.00 in monies of the United States Department of Housing and Urban Development to Franklin Construction Company for construction work allegedly performed on the Orr Weathers Buildings E-3 and E-4, when, in fact, A. WENDELL WHEADON knew that such work had not been peformed; all in violation of Title 18, United States Code, Sections [sic] 201(c)(2). COUNT 7
On or about June 2, 1982, in St. Clair County, within the Southern District of Illinois and elsewhere, A. WENDELL WHEADON, in the capacity of Executive Director of the East St. Louis, Illinois Housing Authority, corruptly did, directly and indirectly, ask, demand, solicit, seek, accept, and receive from ROBERT F. JACOX, owner of Franklin Construction Company, $ 11,604.00 in return for A. WENDELL WHEADON being influenced in committing and allowing a fraud on the United States by approving the payment of $ 12,500.00 in monies of the United States Department of Housing and Urban Development to Franklin Construction Company *702 for construction work allegedly performed on the Orr Weathers Buildings E-3 and E-4, when, in fact, A. WENDELL WHEADON knew that such work had not been performed; all in violation of Title 18, United States Code, Sections [sic] 201(c)(2). COUNT 8
On or about June 8, 1982, in St. Clair County, within the Southern District of Illinois and elsewhere, A. WENDELL WHEADON, in the capacity of Executive Director of the East St. Louis, Illinois Housing Authority, corruptly did, directly and indirectly, ask, demand, solicit, seek, accept, and receive from ROBERT F. JACOX, owner of Franklin Construction Company, $ 6,048.32 in return for A. WENDELL WHEADON being influenced in committing and allowing a fraud on the United States by approving the payment of $ 9,000.00 in monies of the United States Department of Housing and Urban Development to Franklin Construction Company for construction work allegedly performed on the Orr Weathers Buildings E-3 and E-4, when, in fact, A. WENDELL WHEADON knew that such work had not been performed; all in violation of Title 18, United States Code, Sections [sic] 201(c)(2). COUNT 9
On or about June 14, 1982, in St. Clair County, within the Southern *703 District of Illinois and elsewhere, A. WENDELL WHEADON, in the capacity of Executive Director of the East St. Louis, Illinois Housing Authority, corruptly did, directly and indirectly, ask, demand, solicit, seek, accept, and receive from ROBERT F. JACOX, owner of Franklin Construction Company, $ 8,182.36 in return for A. WENDELL WHEADON being influenced in committing and allowing a fraud on the United States by approving the payment of $ 23,000.00 in monies of the United States Department of Housing and Urban Development to Franklin Construction Company for construction work allegedly performed on the Orr Weathers Buildings E-3 and E-4, when, in fact, A. WENDELL WHEADON knew that such work had not been performed; all in violation of Title 18, United States Code, Sections [sic] 201(c)(2). COUNT 10
On or about July 16, 1981, in St. Clair County, within the Southern District of Illinois and elsewhere, A. WENDELL WHEADON, in his capacity as Executive Director of the East St. Louis, Illinois Housing Authority, did embezzle, steal, and knowingly convert to his own use $ 41,000.00 in money of the United States Department of Housing and Urban Development; all in violation of Title 18, *704 United States Code, Section 641. COUNT 11
On or about July 28, 1981, in St. Clair County, within the Southern District of Illinois and elsewhere, A. WENDELL WHEADON, in his capacity as Executive Director of the East St. Louis, Illinois Housing Authority, did embezzle, steal, and knowingly convert to his own use $ 30,000.00 in money of the United States Department of Housing and Urban Development; all in violation of Title 18, United States Code, Section 641. COUNT 12
On or about May 17, 1982, in St. Clair County, within the Southern District of Illinois and elsewhere, A. WENDELL WHEADON, in his capacity as Executive Director of the East St. Louis, Illinois Housing Authority, did embezzle, steal, and knowingly convert to his own use $ 10,000.00 in money of the United States Department of Housing and Urban Development; all in violation of Title 18, United States Code, Section 641. COUNT 13
On or about May 24, 1982, in St. Clair County, within the Southern District of Illinois and elsewhere, A. WENDELL WHEADON, in his capacity as Executive Director of the East St. Louis, Illinois Housing *705 Authority, did embezzle, steal, and knowingly convert to his own use $ 10,000.00 in money of the United States Department of Housing and Urban Development; all in violation of Title 18, United States Code, Section 641. COUNT 14
On or about June 2, 1982, in St. Clair County, within the Southern District of Illinois and elsewhere, A. WENDELL WHEADON, in his capacity as Executive Director of the East St. Louis, Illinois Housing Authority, did embezzle, steal, and knowingly convert to his own use $ 11,604.00 in money of the United States Department of Housing and Urban Development; all in violation of Title 18, United States Code, Section 641. COUNT 15
On or about June 8, 1982, in St. Clair County, within the Southern District of Illinois and elsewhere, A. WENDELL WHEADON, in his capacity as Executive Director of the East St. Louis, Illinois Housing Authority, did embezzle, steal, and knowingly convert to his own use $ 6,048.32 in money of the United States Department of Housing and Urban Development; all in violation of Title 18, United States Code, Section 641. COUNT 16
On or about June *706 14, 1982, in St. Clair County, within the Southern District of Illinois and elsewhere, A. WENDELL WHEADON, in his capacity as Executive Director of the East St. Louis, Illinois Housing Authority, did embezzle, steal, and knowingly convert to his own use $ 8,182.36 in money of the United States Department of Housing and Urban Development; all in violation of Title 18, United States Code, Section 641. COUNT 17
On or about April 15, 1982, in St. Clair County, within the Southern District of Illinois and elsewhere, A. WENDELL WHEADON did willfully and knowingly make and subscribe a U.S. Individual Tax Return - Form 1040, which was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service, which said Income Tax Return he did not believe to be true and correct as to every material matter in that the said Income Tax Return declared that his taxable income for the calendar year 1981 was $ 91,793.38, and his tax liability was $ 15,681.83, whereas, as he then and there well knew and believed, his true and correct taxable income for said year was $ 335,664.88, and his true and corrected [sic] *707 tax liability was $ 172,938.09; all in violation of Title 26, United States Code, Section 7206(1). COUNT 18
On or about April 15, 1983, in St. Clair County, within the Southern District of Illinois and elsewhere, A. WENDELL WHEADON did willfully and knowingly make and subscribe a U.S. Individual Tax Return - Form 1040, which was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service, which said Income Tax Return he did not believe to be true and correct as to every material matter in that the said Income Tax Return declared that his taxable income for the calendar year 1982 was $ 29,578.41, and his tax liability was $ 5,480.00, whereas, as he then and there well knew and believed, his true and correct taxable income for said year was $ 118,588.89, and his true and corrected [sic] tax liability was $ 46,743.45; all in violation of Title 26, United States Code, Section 7206(1). APPENDIX B In a memorandum dated May 24, 1985, Judge William L. Beatty, U.S. District Court for the Southern District of Illinois, as trier of fact in United States v. Wheadon, Crim. No. 84-30029, set forth the following: *708 FINDINGS OF FACT AND CONCLUSIONS OF LAW
This criminal case came on for trial before the Honorable William L. Beatty, District Judge, on a [sic] 18-count indictment. The defendant knowingly and voluntarily waived trial by jury, and the trial was heard by the Court as trier of fact. The first count of the indictment charged that the defendant entered into a conspiracy with Robert Jacox, James G. Randle, and Walter Avant to defraud the United States Department of Housing and Urban Development (HUD) by obtaining payment of HUD monies from the East St. Louis Housing Authority (HA) which were disbursed upon the presentation of false and fraudulent claims in violation of Title 18, U.S.C. § 286. Count two of the indictment charged the defendant with making a knowing false and fraudulent representation to HUD as to a material fact; that is, he falsely certified to HUD on a requisition for funds form that all HUD regulations had been complied with in a construction and renovation contract between the HA and Franklin Construction Company (FCC), when, in fact, the defendant knew that FCC had not and did not post a performance and payment bond as required in violation of Title 18, U.S.C. *709 § 1001. Counts three through nine, inclusive, of the indictment charged the defendant with demanding and receiving monetary kickbacks from Robert Jacox in exchange for the defendant's committing a fraud on the United States through his approval of payment of HUD monies by the HA to FCC for construction work which the defendant knew that FCC had not performed in violation of Title 18, U.S.C. § 201(c)(2). Counts ten through sixteen, inclusive, of the indictment charged the defendant, in his capacity as Executive Director of the HA, with embezzling and knowingly converting HUD monies to his own use in violation of Title 18, U.S.C. § 641. Counts 17 and 18 of the indictment charged the defendant with making and subscribing to federal income tax returns which he knew were not true and correct in that he did not report as gross income the monies he had diverted from HUD and the HA, in violation of Title 26, U.S.C. § 7206(1). Throughout the years 1980 through 1982, the HA was a municipal corporation established under the laws of the State of Illinois. In this capacity the HA contracted with HUD to receive HUD monies for the purpose of implementing various Congressionally-legislated *710 low income public housing projects. The HA's administration of these projects and of the use of HUD monies was governed and monitored by the retention of federal control to promote federal objectives and to assure compliance of federal regulations. The HA was governed by a five-member board of commissioners who appointed the defendant to serve as the HA's Executive Director. The defendant held this position from late 1979 until July, 1982, when he was terminated. In June 1980, the defendant, on behalf of the HA, submitted to HUD a unique low-income housing project proposal calling for the conversion of the Orr Weathers Buildings E3 and E4 (OW) to condominiums. The defendant originated and developed this innovative concept. In October, 1980, the HA contracted with the architectural firm of J. G. Randle & Associates to design the plans and specifications for this project and to inspect the construction work as it progressed. On November 5, 1980, the HA received HUD approval of this modernization project on the OW buildings and allocated $ 2,517,000 for the total project. On December 19, 1980, the HA and HUD amended their annual contributions contract to include this project. *711 In later 1980, Booker Ford approached James Dwyer and discussed the idea of leasing and renovating certain property owned by Dwyer in St. Louis, Missouri, to open as a restaurant/lounge business. Further discussions occurred in early 1981 with the defendant meeting with Dwyer and Ford, wherein the defendant represented that he would provide the money for the lease, renovation, and operation of the business out of his law practice and work at the HA, and that Ford would provide the managerial and operating experience. On March 2, 1981, a partnership agreement was executed in which the defendant had a 66 2/3% interest and Ford a 33 1/3% interest. Also in March 1981, a commercial lease agreement for the St. Louis property was signed by the defendant, Ford and Dwyer. Prior to this, the defendant had asked Robert Jacox to assist him in acquiring a bank loan for the renovation of the restaurant. Because the property was leased, it could not be posted as collateral, and a loan was impractical. The defendant then told Jacox that the HA would soon be awarding a large construction contract and that Jacox's company, FCC, would get the contract if Jacox would give the defendant what monies *712 he required for the restaurant renovation out of this contract and other contracts that FCC had with the HA. The defendant additionally promised Jacox future HA contracts and some return on the money when the restaurant opened in order for Jacox to complete the construction work. Jacox, believing the defendant as Executive Director of the HA would prevent him from being paid on-going HA contracts and foreclose him from future HA contracts, agreed to this proposal of the defendant. In early April 1981, the HA publicly advertised for bids on the construction contract for the OW modernization project. Acting on the defendant's representation, Jacox, through FCC, began demolition and debris clean-up at OW on April 15, 1981. On April 20, 1981, the bid opening for the OW construction contract was held at the HA. One bid only had been submitted by FCC in the amount of $ 2,254,000. On April 7, 1981, Articles of Incorporation were filed in the name of Mr. Ford's Restaurant & Lounge, with the defendant and Booker Ford acting as incorporators and officers of the corporation. In early May, 1981, renovation work had begun on the restaurant. On May 15, 1981, Jacox prepared [sic] AIA #1 *713 requesting payment from the HA in the amount of $ 98,100, for work done at OW during the time period from April 15 to May 15. The same day, James G. Randle explicitly authorized his secretary Carolyn Walker to certify this AIA payment request in his name although he did not physically inspect the premises. Similarly, on May 15, the defendant signed AIA #1 approving payment on behalf of the HA. On May 18, 1981, Lamar Ashford, on behalf of L & L Equipment Company, contracted with the defendant and Ford to do some renovation work on the restaurant. Ashford had been told by the defendant that the defendant and Ford were the owners and that the defendant was getting money for the renovation from and SBA loan or a bond issue. On May 26, 1981, Jacox and the HA executed a construction contract for FCC to do the modernization work on OW for $ 2,254,000. FCC could not and did not post a payment and performance bond on this contract. Jacox had previously told the defendant this and the defendant stated that FCC would not have to. On May 19, 1980, the defendant, on behalf of the HA, signed a HUD form requisitioning $ 1.4 million from HUD for the OW project. On June 1, 1981, a check drawn *714 on the Mr. Ford's Restaurant account, signed by the defendant, payable to L & L Equipment Company in the amount of about $ 36,000, bounced. The defendant told Lamar Ashford that it would be made good "tomorrow." On the same day, Jacox prepared and signed AIA #2 requesting payment by the HA in the amount of $ 261,000 for the OW contract. The next day, Mary Moseley, upon Randle's authority, signed Randle's name as certifying that this amount of work had been completed, although no inspection of this work had occurred. The same day, June 2, the defendant authorized HA payment by signing AIA #2, and the HA issued a check to FCC in that amount on that day. Jacox endorsed this check and purchased a $ 38,000 cashier's check from its proceeds, payable to Mr. Ford's with L & L Equipment as the remitter. This cashier's check was issued and deposited into Mr. Ford's bank account on June 3, making good the $ 36,000 check to L & L Equipment that bounced on June 1. In June, 1981, the defendant told Jacox to hire Phoenix Construction and Management Company (PCMC) as construction manager on the OW contract. The defendant's reasoning was that PCMC had been receiving too many HA contracts and *715 the HA board was getting upset; therefore, PCMC could work on OW as construction managers for FCC and be employed, but not receive HA contracts or money directly. FCC entered an oral contract with PCMC to undertake the construction management of OW. Also in June, PCMC contracted with the defendant and Booker Ford to work on the renovation of Mr. Ford's. The same month PCMC began working on both OW and Mr. Ford's pursuant to these contracts. On June 4, 1981, Jacox prepared and signed AIA #3 requesting the HA pay FCC $ 68,974.76 on the OW contract. Carolyn Walker, with Randle's permission, signed Randle's name certifying completion of this work, although Randle did not inspect the work. On July 1, 1981, the defendant authorized payment in this amount by the HA. Approximately this time, a discussion occurred between the defendant and Jacox, wherein the defendant told Jacox to pay him further monies by cashier's check using the name S.M.S. Construction Company as remitter (SMS). On July 9, 1981, Jacox prepared and signed AIA #4 requesting the HA pay FCC $ 236,974 on the OW contract. Walker, with Randle's knowledge, signed Randle's name certifying completion of this work, although *716 Randle did not inspect the work. The defendant orally approved payment by the HA to FCC, which check was issued on July 14, 1981. Jacox took $ 41,000 from this amount of $ 236,974 on the next day and purchased a cashier's check payable to the defendant with SMS as remitter. On July 28, 1981, Jacox utilized another $ 30,000 from the HA check proceeds and bought a cashier's check from SMS to the defendant. Jacox gave both cashier's checks to the defendant. The renovation of Mr. Ford's was continuing and bills were mounting. In the fall of 1981, Jacox billed the HA for other work performed under other contracts, although the work was not done. The defendant approved payment by the HA. On August 21, Jacox received a HA check for paving work in the amount of $ 11,931.50 payable to the defendant from SMS, which he gave to the defendant. Jacox received another Housing Authority check on August 28 for $ 21,000 out of which he bought a $ 14,500 cashier's check on the same day, which he gave to the defendant. On September 4, Jacox received a HA check for $ 30,000 for a scattered site contract. He bought a $ 25,040 cashier's check on that day out of the proceeds and gave it to the *717 defendant. On September 25, at Jacox's request, Walter Avant as PCMC construction manager, prepared AIA #5 requesting the HA pay FCC $ 444,766.57 for the OW contract. Jacox signed this on that day as did Mary Moseley, with the approval of James G. Randle, although Randle had not inspect [sic] the project. In September, the HA submitted its first quarterly report to HUD on the OW project, wherein Barry Hogue represented that $ 600,000-$ 700,000 had been disbursed by the HA to FCC under the contract. On September 23, Jacox received a HA check for $ 75,000 which he had billed on his paving contract. The defendant had approved payment. Jacox used $ 8,400 to buy a cashier's check which he gave to the defendant. In September or October, 1981, FCC and PCMC stopped all work on the OW contract, although PCMC continued work at Mr. Ford's. In October, the defendant requested C.P.A. Early Wilson to prepare a financial statement for him. During the discussions, the defendant provided Wilson with Mr. Ford's bank statements and cancelled checks along with the Ford and Wheadon partnership agreement. The defendant told Wilson that he was acquiring money to put into Mr. Ford's from "friends". *718 The defendant represented that Mr. Ford's was his and Booker Ford's. Additional monies were given by Jacox to the defendant out of HA checks from October through December. On October 16, Jacox received a HA check for $ 83,500, and on the same day he gave the defendant a $ 53,000 cashier's check bought from these proceeds. On November 12, Jacox received two HA checks totalling $ 30,000 and used all these proceeds to buy a cashier's check for the defendant on the same day. On December 9, Jacox received two more HA checks totalling $ 90,020, out of which he bought a cashier's check for $ 30,000 to give to the defendant on the next day. Also, on December 10, Avant prepared AIA #6 requesting the HA pay $ 101,700.81 for the OW contract. Jacox signed the document on that date, as did Walker for J. G. Randle. The defendant verbally approved payment. In December, Early Wilson prepared a second financial statement for the defendant on Mr. Ford's. Also in this month, Barry Hogue prepared the second quarterly report to send to HUD. This report stated that $ 1 million had been disbursed on the OW contract. Hogue discussed with the defendant his concern that there was not enough work *719 done at OW to justify the large expenditure. The defendant stated that he would take care of it. On January 11, 1982, Jacox received a HA check for $ 16,850 for work done at OW. He used $ 10,727 of this amount to buy a cashier's check for the defendant on the same day. Two days later, Jacox received a HA check for $ 47,831 out of which he gave the defendant $ 10,000 in a cashier's check. On February 18, 1982, Walter Avant prepared AIA #7 for $ 71,309.34 on the OW contract which was signed by Jacox. Walker, on behalf of Randle, certified this work had been done on the same day. The AIA was submitted to the HA. Four days later, HUD conducted a management review of the HA, particularly examining the OW project. HUD employee Phyllis Griffin could not locate many of the OW documents and cancelled checks at the HA, which the defendant stated that he would find and give to her. This was not done. Griffin advised the defendant that the HA bookkeeping was in bad shape, to which the defendant said that he was a CPA and there was nothing wrong with the HA books. Griffin also told the defendant that the HA could not disburse or issue any more checks for any payments without [sic] *720 prior HUD approval. The defendant replied that HUD could not do this. On March 11, Jacox received a HA check for $ 8,200 out of which he bought a $ 6,000 cashier's check on the same day to give to the defendant. In early April, 1982, C.P.A. Wilson prepared, at the defendant's request, a partnership income tax return in the name of Ford and Wheadon, representing investment credit allowed to the defendant for his 100% contribution to Mr. Ford's. Mr. Ford's had not opened for business yet as the renovation was not completed. This partnership return was never filed. On April 15, the defendant did file his 1981 1040 income tax return and attached a Schedule K-1 reflecting investment tax credit for a 1/2 contribution in a partnership between him and Jacox. On May 5, Jacox received a HA check for $ 11,500 on the OW contract. He used $ 10,593 to buy a cashier's check to give to the defendant on the next day. On May 13, Jacox, who was out of town, telephoned his secretary Lillie Reeves. He told her to take an invoice to the HA, to call the defendant and tell him to make sure the check is ready, and then to go to Jacox's bank in Edwardsville to deposit some of the money, to get some *721 cash, and to buy a cashier's check for the defendant with $ 5,000 of the money. Reeves took two invoices to the HA. The HA issued two checks on that day totalling $ 14,000. The defendant delivered these two checks to Reeves and drove Reeves to the Edwardsville National Bank. Reeves deposited some of the money, cashed some, and bought a cashier's check for $ 5,855 payable to the defendant from SMS. Reeves then gave this check to the defendant. On May 14, Jacox told Avant to prepare another AIA for $ 106,000. On May 17, Jacox signed AIA #8 requesting the HA to pay $ 106,753.49 on the OW contract. The defendant delivered this AIA to James G. Randle, who certified the work had been done although he performed no inspection. The defendant paid Randle $ 5,000 in HA monies as partial payment for architectural fees. On the same date, Jacox received a HA check in the amount of $ 16,600 for the OW contract on AIA #8. He used $ 10,000 to buy a cashier's check and gave it to the defendant. On May 20, a sales contract for Mr. Ford's was signed by James Dwyer, the defendant and Booker Ford. On May 24, Jacox received a $ 10,000 HA check issued upon AIA #8, and purchased a cashier's check *722 with the entire amount for the defendant. On June 2, Jacox received a $ 12,500 HA check also issued upon AIA #8 and purchased an $ 11,604 cashier's check for the defendant. On June 8, Jacox received a $ 9,000 HA check pursuant to AIA #8, and used $ 6,048.32 to buy a cashier's check for the defendant. On June 14, Jacox received a $ 10,000 HA check supported by AIA #8, and purchased an $ 8,181.36 cashier's check for the defendant on the same day. In early July, 1982, James Dwyer loaned thedefendant and Ford $ 20,000 to help open the restaurant. On July 4, Mr. Ford's opened for business. On July 16, 1982, the defendant was terminated from his position at the HA. In August, Mr. Ford's business began declining. On August 30, 1982, James G. Randle inspected OW for the first time and determined that only approximately $ 250,000 work had been completed. On October 1, a new partnership agreement was executed involving Mr. Ford's. The partners were the defendant with 50%, Booker Ford with 16 1/2% and Benjamin Thomas with 33 1/2% participation. The defendant told C.P.A. Wilson that Thomas had put some money into Mr. Ford's and had become a partner. In the fall of 1982, a meeting *723 occurred at Mr. Ford's consisting of the defendant, Randle, Jacox and Avant. Its purpose was how to document more work on the OW project. In November, 1982, a meeting took place with Dwyer, Jacox, the defendant, Booker Ford and Benjamin Thomas. Jacox stated that the money he put into Mr. Ford's was his, and he would assume an active role. The defendant promised Jacox 80% ownership if Jacox would take over the restaurant. Jacox, thereafter, did take an active role in the business. Also, in November, Jacox gave to his tax return preparer, Johnny Scott, a Schedule K-1 in the name of Wheadon and Jacox, which had been given to him by the defendant earlier in the year. This Schedule K-1 was not filed with Jacox's income tax return because the investment tax credit was not needed. In 1984, Fred Spinti, a HUD Cost Analyst, inspected the OW site and determined that only approximately $ 135,000 work had been completed. The amounts of money in each cashier's check payable to the defendant with the remitter as SMS were the exact amounts demanded by the defendant of Jacox. Most of the cashier's check monies were deposited by the defendant into Mr. Ford's bank account, with the exception *724 of some cash withheld. No regular business records were kept and maintained as to Mr. Ford's, other than bank statements and cancelled checks. Jacox did not discuss Mr. Ford's with his attorney or tax adviser until at least July, 1982. To sustain the charge that the defendant conspired with others to defraud the government by obtaining and aiding to obtain the payment of false and fraudulent claims as charged in Count 1, the government must prove the following propositions: First, that the defendant entered into a conspiracy to defraud the government; Second, that, in furtherance of this conspiracy, the defendant obtained or aided in obtaining the payment of a false or fraudulent claim; Third, that the defendant knew the claim was false or fraudulent; and Fourth, that the defendant submitted or caused the submission of the claim with the intent to defraud. In order to establish the offense of conspiracy, the government must prove these elements beyond a reasonable doubt: 1. that the alleged conspiracy existed, and 2. that an overt act was committed in furtherance of the conspiracy, and 3. that the defendant knowingly and intentionally became a member of the conspiracy. *725 The Court finds the defendant guilty beyond a reasonable doubt as to Count 1 of the Indictment. In so finding, the Court makes these additional findings: 1. That while the defendant was Executive Director of the HA in early 1981, he decided to enter into a partnership with Booker Ford to renovate a building in St. Louis and to thereafter open it as a restaurant/lounge. 2. That the defendant, while having substantial income, had inadequate assets and resources to produce the monies to invest in this business. 3. That the defendant knew that Robert Jacox, through FCC and B & B Sheet Metal (B & B), had existing contracts with the HA. 4. That the defendant knew that the HA would be awarding a construction contract of more than $ 2 million for the HUD modernization project on OW. 5. That the defendant, in about March, 1981, approached Jacox and did solicit and demand monies from Jacox due upon Jacox's HA contracts for the renovation of Mr. Ford's, in return for which the defendant promised to award Jacox the OW and other HA contracts, to which Jacox agreed. 6. That the defendant conceived the idea of Jacox purchasing cashier's checks, in the amounts of money the defendant *726 needed, made payable to the defendant with the remitter being SMS Construction Company. 7. That the defendant did not offer, nor intend, that Jacox have any business interest nor investment in Mr. Ford's, but that SMS was a mere subterfuge to transfer HA monies from Jacox to the defendant. 8. That the defendant approved Jacox's pay requests to the HA on the OW and other contracts, either in writing or verbally, and that the defendant knew the pay requests were false and fraudulent in that they contained the amounts of money the defendant had told Jacox that he needed for the restaurant renovation, which amounts of money the defendant did receive from Jacox either the same day or shortly after the HA issued its checks to Jacox. 9. That the defendant knew the construction work on OW was not performed in accord with the AIA pay requests. 10. That the defendant knew that James Randle was not inspecting the OW work site as evidenced by his actions on May 17, 1982. 11. That the defendant knew that about $ 1.4 million had been disbursed to Jacox on the OW contract. 12. That the defendant conspired with Jacox, Randle and others to defraud HUD by obtaining and aiding to obtain *727 payment of HUD monies from the HA issued upon the presentation of false and fraudulent claims for pay requests. To sustain the charge of making a false or fraudulent statement as charged in Count 2, the government must prove the following propositions: First, that the defendant made and used, or caused to be made and used, a false writing or document in relation to a matter within the jurisdiction of a department or agency of the United States; Second, that the defendant did such act with the knowledge that the writing or document was false or fictitious in some material particular; and Third, that the defendant did such act knowingly and willfully. The Court finds that, although the defendant knew that Jacox and FCC did not post a payment and performance bond on the OW contract, the certification on Government's Exhibit 1E is ineffectual to establish that the defendant falsely represented to HUD that a bond had been posted. The Court thereby finds the defendant not guilty on Count 2. To sustain the charge of soliciting and receiving a bribe as charged in Counts 3 through 9, inclusively, the government must prove the following propositions: First, that the defendant was a public *728 official; Second, that the defendant corruptly asked, demanded, solicited, sought, accepted or received a thing of value; and Third, that he did so in return for being influenced in committing or allowing a fraud on the United States. The Court finds the defendant guilty beyond a reasonable doubt as to each of Counts 3 through 9, inclusive, and further finds the following specifically: 1. That the defendant, as Executive Director of the HA, was a "public official". 2. That the defendant conceived a scheme to acquire monies for Mr. Ford's wherein he solicited and received monies from Jacox paid out of HA contract disbursements. 3. That the defendant, by soliciting and receiving these monies, was influenced in allowing a fraud to be committed on HUD by the promising of contracts to Jacox and by the approval of pay requests by the HA of HUD monies to Jacox which he knew to be fraudulent in that the kickback amounts he received were included in the pay request totals. To sustain the charge of theft of government property as charged in Counts 10 through 16, inclusively, the government must prove the following propositions: First, that the money described in the indictment *729 belonged to the United States and had a value in excess of $ 100 at the time alleged; Second, that the defendant embezzled, stole, or converted such money to his own use, and Third, that the defendant did so knowingly with the intent to deprive the owner of the use or benefit of the money so taken. The Court finds the defendant guilty beyond a reasonable doubt as to each of Counts 10 through 16, inclusive. In so finding, the Court makes these additional findings: 1. That the defendant, in his capacity of Executive Director of the HA, had lawful possession of HUD monies to be used by the HA in carrying out various HUD-approved projects. 2. That the defendant embezzled and converted HUD monies to his own use by approving, in writing or verbally, the disbursement of HUD monies from the HA to Jacox who, in turn, paid the defendant the monies reflected in each Count out of these disbursements. 3. That the defendant knew the monies he received in cashier's checks from Jacox were HUD monies disbursed by the HA. 4. That the defendant did these acts with the intention of depriving HUD and the HA of the use or the benefit of the monies he received. To sustain the charge of making *730 and subscribing to false income tax returns as charged in Counts 17 and 18, the government must prove the following propositions: First, that the defendant made and subscribed to the tax returns for the tax years 1981 and 1982 under the penalties of perjury; and Second, that the defendant willfully and knowingly made a material misstatement in these tax returns. The Court finds the defendant guilty beyond a reasonable doubt on each of Counts 17 and 18. In so finding, the Court makes the following additional findings: 1. That the defendant did prepare, sign and file Forms 1040, Federal Income Tax Returns, for the years 1981 and 1982, which were made and signed under penalties of perjury. 2. That Robert Jacox was not a partner in, nor had any interest or investment in, Mr. Ford's throughout 1981 until sometime in or after July, 1982, following the disbursement of the HA monies to Jacox and the termination of the defendant as Executive Director. 3. That the monies received by the defendant from Jacox were income to the defendant. 4. That the defendant did not report any of these monies on either income tax return when he knew, in fact, they were income to him. 5. That the *731 defendant's willful failure to include these monies as gross income on his tax returns was a material misstatement resulting in the filing of false and fraudulent tax returns by the defendant. Footnotes
1. Although petitioner and Rosetta F.D. Wheadon filed joint Federal income tax returns for the years at issue, the notice of deficiency, in this case, only determined deficiencies and additions to tax against petitioner.↩
1. Although sec. 6653(b)(1)↩ provides for additions to tax in an amount equal to 50 percent of the underpayment, respondent appears to have based this addition on petitioner's total corrected tax liability, not the amount of the underpayment.
2. While Mr. Jacox and Mr. Avant were also criminally charged with conspiracy to defraud HUD, no criminal charges were filed against Mr. Randle. ↩
3. The indictment is reproduced in Appendix A. ↩
4. Judge Beatty's memorandum setting forth his findings of fact and conclusions of law is reproduced in AppendixB.↩
5. Respondent asserts that petitioner embezzled and converted to his use $ 281,871.50 and $ 89,008.68 during 1981 and 1982, respectively. Nevertheless, by our calculations, the District Court found petitioner to have embezzled and converted to his own use $ 94,008.68 during 1982. See Appendix B, infra↩ pp. 36-40.
6. We note that petitioner's reported 1981 capital contribution of $ 376,111 to the Ford-Wheadon partnership approximates the $ 375,880.18 that the District Court found petitioner received from Mr. Jacox between May 1981 and July 1982.↩
7. While this argument might appear to be supported by petitioner's response of "partnership" to the question, "What type of entity is this partner?" found on the Ford-Wheadon partnership's Schedule K-1 attached to petitioner's 1981 income tax return, the District Court did make findings, in support of its guilty verdicts under sec. 7206(1), that Mr. Jacox was not a partner in, nor had any interest or investment in the Ford-Wheadon partnership throughout 1981 and until sometime in or after July 1982. See Appendix B, infra↩ pp. 41, 45.
8. Petitioner has apparently failed to notice that Commissioner v. Wilcox, 327 U.S. 404 (1946), was overruled by the U.S. Supreme Court over 30 years ago. James v. United States, 366 U.S. 213, 219-220↩ (1961).
9. As applicable to petitioner's conviction for willfully and knowingly subscribing to a false 1981 income tax return, sec. 7206 provides, in part: Any person who -- (1) Declaration under penalties of perjury. -- Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter; or * * * * shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $ 5,000 or imprisoned not more than 3 years, or both, together with the costs of prosecution. In sec. 329(c) of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 618, Congress amended the penalty provision of sec. 7206↩ to raise the maximum fine to $ 100,00 ($ 500,000 in the case of a corporation), applicable to offenses committed after Sept. 3, 1982. This amendment applies to petitioner's conviction for willfully and knowingly subscribing to a false 1982 income tax return. 10. 18 U.S.C. sec. 641 (1988) provides: Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells conveys or disposes of any record, voucher, money, or thing of value of the United States or any department or agency thereof * * * * * * * Shall be fined not more than $ 10,000 or imprisoned not more than ten years, or both; but if the value of such property does not exceed the sum of $ 100, he shall be fined not more than $ 1,000 or imprisoned not more than one year, or both.↩
11. Other elements the Government proved, beyond a reasonable doubt, to obtain petitioner's convictions, were that petitioner: entered into a conspiracy to defraud the Government; obtained or aided in obtaining the payment of a false or fraudulent claim; knew the claim was false or fraudulent; submitted or caused the submission of the claim with the intent to defraud; was a public official; corruptly asked, demanded, solicited, sought, accepted or↩ received a thing of value; and did so in return for being influenced in committing or allowing a fraud on the United States.
12. We find no evidence in the record to support petitioner's assertion, on brief, that he was denied access to relevant documents that the U.S. attorney and respondent subpoenaed in preparation for petitioner's criminal trial. Although discovery requests are not normally filed with the Court, see Rules 71(c) and 72(b), and we returned, unfiled, "Petitioner's Request for Production of Documents" dated Sept. 20, 1991 for this reason, petitioner never filed a motion with this Court requesting a ruling on respondent's failure to produce or permit inspection of any document requested. See 72(b). Moreover, petitioner did not present any other documents that would have substantiated his right to the investment tax credit.↩
13. As applicable to the year 1981, sec. 6653(b) provides: Fraud. -- If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * * In sec. 325(a) of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 616, Congress amended sec. 6653(b). The amendments apply with respect to taxes the last day prescribed for payment of which (regardless of any extension) is after Sept. 3, 1982. Thus, these amendments apply to petitioner's 1982 tax year, and they provide: Fraud. -- (1) In General. -- If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. (2) Additional Amount For Portion Attributable To Fraud. -- There shall be added to the tax (in addition to the amount determined under paragraph (1)) an amount equal to 50 percent of the interest payable under section 6601 -- (A) with respect to the portion of the underpayment described in paragraph (1) which is attributable to fraud, and (B) for the period beginning on the last day prescribed by law for payment of such underpayment (determined without regard to any extension) and ending on the date of assessment of the tax (or, if earlier, the date of the payment of the tax).↩