Robert G. **CLARK** and Kathleen Clark, Appellants,

v.

**IOWA DEPARTMENT OF REVENUE AND FINANCE,** Appellee.

No. 00–1969.

Supreme Court of Iowa.

May 8, 2002.

Ronald L. Mountsier of Smith, Schneider, Stiles & Serangeli, P.C., Des Moines, for appellants.

Thomas J. Miller, Attorney General, Harry M. Griger, Special Assistant Attorney General, and Valencia Voyd McCown, Assistant Attorney General, for appellee.

CADY, Justice.

The Iowa Department of Revenue and Finance assessed taxes and penalties against Robert and Kathleen Clark for failing to report embezzled income as taxable income in their joint tax returns for the years 1983 through 1993. The district court upheld the Department's assessments. We affirm the decision of the district court.

## I. Background Facts and Proceedings.

This appeal stems from the embezzlement of approximately $1 million by Robert Clark from Iowa Methodist Medical Center (IMMC) over a period of eleven years. At the time of the embezzlement, Robert was the director of IMMC's pharmacy. He received his pharmacy degree from the University of Iowa, and completed post-graduate work at Drake University. Robert's wife, Kathleen, was also a college graduate, and worked as a substitute elementary school teacher during 1986 and 1987.

Early in 1994, IMMC terminated Robert's employment for reasons unrelated to these proceedings. Following his discharge, IMMC noticed financial discrepancies in its accounts, and an extensive internal investigation subsequently concluded Robert had diverted approximately $900,000 from an account established to operate the Iowa Poison Information Center (IPIC), in addition to approximately $100,000 in cash from the pharmacy's cash registers. Robert had signatory authority under the IPIC account. The account was established to fund a hotline for answering questions concerning the ingestion of poisonous substances. Before the embezzlement began in 1983, the IPIC account contained $38.92. Over the next ten years, the IPIC account experienced an overwhelming influx of deposits and withdrawals made by Robert.

There were three means utilized by Robert to accomplish his embezzlement through the IPIC account. First, Robert deposited drug rebates from pharmaceutical companies into the IPIC account instead of into IMMC's bank accounts. Likewise, Robert deposited payments made by hospital patients and employees for prescription drug purchases from the out-patient and main hospital pharmacies into the IPIC account. Additionally, Robert misappropriated "loan and borrow" repayments. The IMMC pharmacy often "loaned" medicine to other pharmacies that had run out of certain prescription drugs. The "borrowing" pharmacy would either compensate IMMC by replacing the borrowed medicine or paying the cost of the drug. Robert often deposited the latter repayments into the IPIC account.

Robert used the embezzled money to make mortgage payments on his home, pay personal credit card bills, and pay other personal expenses. Sometimes, Robert drew checks directly from the IPIC account to make these payments. Other times, Robert would write a check to Kathleen, who would then deposit the

check into her own account. Kathleen would then write a check to Robert who would, in turn, deposit the check into his own account. Although both Robert and Kathleen had separate banking accounts, they both had authority to write checks from the other's account, and frequently exercised this authority. This evidence led IMMC to conclude Kathleen knew of her husband's embezzlement and, in fact, aided him in laundering money.

Additionally, IMMC relied on Kathleen's standard of living as further evidence of her knowledge of Robert's embezzlement. Kathleen and Robert's expenditures and standard of living greatly exceeded their reported income as reported on their joint tax returns. For example, in the 1989 taxable year, they purchased art and incurred travel expenses exceeding twenty percent of their combined taxable income. In 1989 alone, they took at least three vacations, all of which involved round-trip air travel and lodging at luxurious hotels. During the eleven years of the embezzlement scheme, Kathleen and Robert never reported annual taxable income in excess of $37,000.

A review of the other taxable years also indicated a high standard of living enjoyed by both Robert and Kathleen compared to their reported income. They purchased $9,349.36 of clothing at an exclusive women's clothing store over a two-year period. A check was drawn from the IPIC account to pay $11,816.16 in charge account purchases at Von Maur, a clothing department store. Furthermore, the Clarks purchased $37,845 in jewelry from a local jewelry store. Their home was extensively refurbished. Records showed they paid $52,735.67 in interior decorator services and $16,710.41 for art gallery purchases. Furthermore, their American Express credit card totaled $34,226 during the years 1988 to 1993, which largely included travel and lodging expenses throughout the United States.

Ultimately, IMMC's investigation was turned over to the county attorney, who filed a trial information against both Robert and Kathleen Clark on November 2, 1994. Robert was charged with thirteen counts of first-degree theft, while Kathleen was charged with seven counts. Robert subsequently pled guilty to ten counts of first-degree theft, in exchange for the dismissal of the remaining three counts against him and the seven counts against Kathleen. The district court accepted the plea, and sentenced Robert to incarceration.

Following an audit by the Internal Revenue Service, the Iowa Department of Revenue and Finance investigated the Clarks' tax returns for the years 1983 through 1993. The Clarks had filed joint returns for those years, and did not report the income Robert embezzled from IMMC as taxable income in any of the years. On May 23, 1997, the Department notified the Clarks it was assessing tax penalties for their failure to include the embezzled income in their tax returns. The Clarks protested the assessments.

In the spring of 1998, Kathleen and Robert filed amended Iowa individual income tax returns for the years 1983 through 1993. The separate amended returns showed the filing status of "Married filing separate returns." The amended returns by Kathleen showed no tax liability due for any tax year. The Department did not accept the amended returns.

A contested case hearing on the assessments was held on June 23, 1998. Several witnesses testified. James Rasmussen, director of internal audit at IMMC, described his investigation of Robert's embezzlement scheme. Ray Presti, private investigator for IMMC, supported Rasmussen's testimony and detailed the evi-

dence he discovered in investigating the Clarks' case. Paul Jackson, the Department revenue examiner who recommended against accepting the Clarks' amended tax returns, also testified. He believed the returns were inadequate and incomplete because they contained estimated interest income and did not include the tax penalties. Moreover, he believed Iowa's tax code did not permit such amendments.

Both Robert and Kathleen provided limited testimony. Robert testified he did not know he was required to report embezzled income as taxable income. Kathleen testified she was unaware of her husband's embezzlement scheme. The administrative law judge later deemed their testimony was not credible. The judge upheld the Department's tax assessments in a written ruling. The Clarks petitioned for judicial review.

The district court denied the Clarks' petition for judicial review. It agreed with the agency's conclusion that Kathleen could not amend her filing status to avoid joint liability. The district court further found substantial evidence of fraud to support the Department's assessments for willfully filing false returns. Lastly, the district court found the administrative law judge's findings were based on admissible evidence.

The Clarks appeal. They first contend the assessments were not permissible because joint liability did not exist for married taxpayers filing jointly in Iowa prior to 1994. Alternatively, they contend Kathleen cannot be liable for the assessments because she filed amended tax returns changing her filing status from married filing joint to married filing separate. Additionally, they claim the district court applied erroneous legal standards in finding there was substantial evidence of fraud. The Clarks further argue the agency relied on inadmissible evidence in upholding the Department's findings.

## II. Standard of Review.

 We review the final decision of an agency concerning the imposition of tax assessments by the Department for errors. *Iannone v. Iowa Dep't of Revenue & Fin.*, 641 N.W.2d 735, 738 (Iowa 2002). We will uphold the agency's findings if they are supported by substantial evidence in the record. *Id.* Moreover, we accord deference to the agency's decision on witness credibility. *Peoples Mem'l Hosp. v. Iowa Civil Rights Comm'n*, 322 N.W.2d 87, 92 (Iowa 1982). Likewise, we respect the expertise of the agency on matters involving its informed discretion, particularly on technical issues. *See Al–Khattat v. Eng'g & Land Surveying Examining Bd.*, 644 N.W.2d 18, 23 (Iowa 2002); *Greenwood Manor v. Iowa Dep't of Pub. Health*, 641 N.W.2d 823, 839 (Iowa 2002); *Peoples Mem'l Hosp.*, 322 N.W.2d at 92. Furthermore, the taxpayer challenging the tax assessment has the burden of proving the Department's decision was erroneous. *Iannone*, 641 N.W.2d at 738–39.

## III. Joint Liability Based on Joint Tax Return.

Iowa Code section 422.21 (1993) prescribes the form of and time frame for filing tax returns. Our legislature amended the section in 1994 to add the following provision:

> If married taxpayers file a joint return ... both spouses are jointly and severally liable for the total tax due on the return, except when one spouse is considered to be an innocent spouse under criteria established pursuant to section 6013(e) of the Internal Revenue Code.

1994 Iowa Acts ch. 1165, § 16 (codified at Iowa Code § 422.21 (1995)). The Clarks

maintain that the absence of the amendment prior to 1994 indicates Iowa did not recognize joint liability for joint tax returns prior to that time.

Contrary to the Clarks' contention, we do not believe this amendment created joint liability in Iowa. Instead, we believe the legislature intended to create an exception to the preexisting common law principle of joint liability for joint acts when it amended section 422.21, and merely stated the principle or rule of joint liability in the context of recognizing an exception to the rule.

■■ The general concept of joint liability has existed in Iowa for many years in various areas of the law. *See, e.g., State, Dep't of Human Servs. v. Unisys Corp.*, 637 N.W.2d 142, 152–53 (Iowa 2001) (a party may seek contribution from another if they are jointly liable); *Gremmel v. Junnie's Lounge, Ltd.*, 397 N.W.2d 717, 723 (Iowa 1986) (joint liability between the direct perpetrator and the aider and abettor of an assault); *Wiedenfeld v. Chicago & N.W. Transp. Co.*, 252 N.W.2d 691, 695 (Iowa 1977) (master and servant both liable for servant's tort committed in course of employment); *Turner v. Hitchcock*, 20 Iowa 310, 316 (1866) (recognizing the existence of joint liability in tort law), *overruled in part on other grounds by Dungy v. Benda*, 251 Iowa 627, 637, 102 N.W.2d 170, 176 (1960) (overruling holding that full release from liability of one joint tortfeasor does not release other joint tortfeasors), *overruled by Cmty. Sch. Dist. of Postville v. Gordon N. Peterson, Inc.*, 176 N.W.2d 169, 175 (Iowa 1970) (holding the release of one obligor does not automatically release the remaining co-obligors). Likewise, joint liability has existed in federal tax law for years. As a general rule, married taxpayers filing joint income tax returns are considered jointly and severally liable for taxes reported due on their combined income, and for additional amounts of tax relating to the initial returns later deemed to be owed. *See* 26 U.S.C. § 6013(d)(3) (1989); *accord Furnish v. Comm'r of Internal Revenue*, 262 F.2d 727, 731 (9th Cir.1958); *Schwimmer v. Comm'r of Internal Revenue*, 72 T.C.M. (CCH) 301 (1996); *Estate of Molever v. Comm'r of Internal Revenue*, 64 T.C.M. (CCH) 1662 (1992). However, if a spouse satisfies certain conditions, that spouse is labeled an "innocent spouse" and is relieved from the tax liability created by the other spouse. *See* 26 U.S.C. § 6013(e); *see also Schwimmer*, 72 T.C.M. (CCH) at 301; *Estate of Molever*, 64 T.C.M. (CCH) at 1662. The innocent spouse relief provisions were promulgated to remedy the injustice sometimes created by operation of the rule of joint liability. *Estate of Molever*, 64 T.C.M. (CCH) at 1662 (legislative history of federal act indicated innocent spouse relief provisions intended to prevent joint liability where "a husband embezzles funds and omits the proceeds from gross income" and the wife has no reason to know of the embezzlement activity). Joint liability for joint conduct is a longstanding legal principle that properly applies to obligations imposed under tax statutes.

We also observe that the Department has specifically recognized joint liability of married taxpayers in tax cases predating the amendment to section 422.21. *See In re Dennis R. Myer & Norma Jean Myer*, Nos. 88–20–1–0179, 90–20–1–0076, 1992 WL 511440, at *4–5 (June 17, 1992) [hereinafter *In re Myer*]. Although we do not consider previous decisions of the Department as precedent, they serve as guidance in our review of claims with no applicable case law. *See* 47A C.J.S. *Internal Revenue* § 10, at 55 (2002) (court may consider long-standing agency construction if reasonable). In *In re Myer*, the Department found the married taxpayers in that case

had willfully filed false returns with the intent to evade payment of tax. Because the married taxpayers filed joint returns, they were subject to the principle of joint liability. As noted by the administrative law judge who denied Myers' protest, "When married couples decide to take advantage of the tax laws by signing and filing only one return as a unit, they must also bear the concomitant statutory responsibilities and liabilities which accompany that decision." *In re Myer*, 1992 WL 511440, at *5. Thus, when married taxpayers file a joint tax return, they must realize they are sharing the liabilities as well as the benefits stemming from the combined return.

■ In short, married taxpayers understand they are sharing responsibility for the tax reported due on the filed return. If an audit reveals additional tax is due from the joint return, married taxpayers also share responsibility for the additional tax. *See Furnish*, 262 F.2d at 731 ("[Joint] liability covers not only the basic tax but also any addition to the tax on account of fraud. . . ."). The amendment to section 422.21 did not create this principle. On the contrary, it merely created an exception to the principle that joint filers assume joint liability for the return.

## IV. Authority to Amend Filing Status.

After receiving the tax assessment notices from the Department, Kathleen and Robert Clark sought to amend their joint tax returns to change their filing status to married filing separate. Although no statute in our tax code prohibits such an amendment, no statute permits it. The provisions of the code discussing the amendment of tax returns only pertain to claims for refunds or credits for overpayments due the taxpayer. *See* Iowa Code § 422.73(2) (discussing limitations periods for taxpayers to amend returns to claim income tax refund or credit); *see also* Iowa Admin. Code r. 701—43.3 (1999) (discussing claims for refunds and corresponding statutes of limitations). Similarly, the administrative rule that requires filing amendments to tax returns applies when a taxpayer learns "the amount of income reported to be federal net income or Iowa taxable income was erroneously stated on the Iowa return, or changed by an Internal Revenue Service audit, or otherwise . . . ." Iowa Admin. Code r. 701—39.3(4) (1997).

■ It is clear neither the Code nor the administrative regulations contemplate the filing of amended returns by taxpayers to change filing status after the taxpayers have been jointly assessed taxes and penalties for the failure to report embezzled funds as income on a joint return. Moreover, there would be no legitimate purpose in amending the filing status under such circumstances. If the spouse is an innocent taxpayer, the amendment is unnecessary because there is no liability for the spouse based upon the joint return.[1] If the spouse is a culpable taxpayer, the amendment will not eliminate the culpability.

We do not believe the legislature contemplated the amendment of tax returns to change the filing status as a means to insulate joint filers from joint liability for the contents of the return. The legislature provided for the amendment of returns in order to permit taxpayers to correct inaccuracies or inconsistencies, not to avoid tax

---

1. The Clarks contend amending the filing status was the only means for an innocent spouse to avoid joint liability in Iowa prior to the 1994 amendment to Iowa Code section 422.21. Because we find Kathleen was not an innocent spouse, we need not address this argument.

liability. *See* Iowa Code § 422.73(2); Iowa Admin. Code r. 701—39.3(4).

## V. Fraudulent Intent.

■ Iowa Code section 421.27(4) imposes a penalty on taxpayers who willfully file a false return with the intent to evade tax. This penalty is substantial and is currently set at seventy-five percent of the amount involved. Iowa Code § 421.27(4). The underlying purpose of the tax penalty is to reimburse the government's expenses for auditing the returns and the actual loss in revenue resulting from the taxpayer's fraud. *Scallen v. Comm'r of Internal Revenue*, 877 F.2d 1364, 1369 (8th Cir.1989).

■ The Department has the burden of proving fraud by clear and convincing evidence. *Id.* A finding of fraud is a question of fact that will be upheld if supported by substantial evidence in the record. *Id.; Edelson v. Comm'r of Internal Revenue*, 829 F.2d 828, 832 (9th Cir.1987). Because direct evidence of fraud rarely exists, we may infer the intent to defraud by examining circumstantial evidence. *Id.; see State v. Johnson*, 196 N.W.2d 563, 567 (Iowa 1972) ("an intent to defraud may properly be inferred from circumstances, words, and actions shown in evidence").

We begin by observing the legal standard applicable to the penalty imposed by section 421.27(4). It is commonly referred to as the fraud penalty, *Scallen*, 877 F.2d at 1369, although the statutory standard that guides the imposition of the penalty is "willfully filing a false return … with the intent to evade tax," Iowa Code § 421.27(4).

In discussing the use of circumstantial evidence to establish fraud, the district court in its written decision indicated fraud under the penalty statute was "not a specific intent offense." The Clarks assert this is an incorrect legal conclusion, and therefore the district court utilized the wrong legal standard in considering the evidence.

We have previously indicated the word "willfully" contained within the text of the statute does not require proof of "evil motive or intent," but is established by "proof of a voluntary and intentional violation of a known legal duty." *State v. Osborn*, 368 N.W.2d 68, 70 (Iowa 1985); *accord Cheek v. United States*, 498 U.S. 192, 201, 111 S.Ct. 604, 610, 112 L.Ed.2d 617, 629 (1991). However, in addition to willfulness, section 421.27(4) requires an "intent to evade tax." Thus, intent is a predicate element to the imposition of the penalty. Nevertheless, our review is from the assessments imposed by the Department. There is no claim the Department applied the incorrect legal standard. Thus, we turn to the record to consider the evidence.

In reviewing the sufficiency of evidence in cases involving claims of false returns, courts frequently consider certain "badges of fraud." Two such "badges" are the "consistent and sizeable underreporting of income" and a method which makes the tracing of the embezzled income difficult. *Scallen*, 877 F.2d at 1370; *accord Furnish*, 262 F.2d at 729. Furthermore, the "intelligence and sophistication of the taxpayer … is an important factor" to consider. *Scallen*, 877 F.2d at 1370–71. Additionally, courts consider the concealment of assets and the attempt to conceal an illegal activity such as embezzlement as indicative of fraudulent intent. *United States v. Guidry*, 199 F.3d 1150, 1157 (10th Cir. 1999); *Furnish*, 262 F.2d at 728–29; *Wheadon v. Comm'r of Internal Revenue*, 64 T.C.M. (CCH) 1172 (1992). Each of these badges of fraud is present in this case.

■ First, Robert and Kathleen consistently reported a taxable income substantially lower than they were actually enjoying for eleven years. An examination

of a three-year period clearly reveals the substantial understatements. For instance, in the taxable year 1991, the Clarks reported a taxable income of $27,055, while Robert diverted income of $110,879 from IMMC. In 1992, they reported $30,923 taxable income, and embezzled $255,055. In 1993, they diverted $170,417, and reported only $34,342. At the same time, Robert and Kathleen were spending large sums of money. While we recognize that understatements of income alone are insufficient to demonstrate fraudulent intent, "[t]he record in this case is replete with other indicia of fraud." *Wheadon,* 64 T.C.M. (CCH) at 1172; *accord Furnish,* 262 F.2d at 728–29.

█ The income omitted by the Clarks originated from the creation of an elaborate embezzlement scheme of misappropriating pharmacy funds into an account which was entrusted to Robert. "It is a fair inference that someone who would embezzle from his employer will conceal such receipts from the government with intent to evade taxes." *Foster v. Comm'r of Internal Revenue,* 57 T.C.M. (CCH) 661 (1989); *accord Barbieri v. Comm'r of Internal Revenue,* 61 T.C.M. (CCH) 2422 (1991) ("knowingly engag[ing] in an illegal activity ... is evidence of a disposition to defraud"). Furthermore, the evidence supports a finding that Robert and Kathleen attempted to conceal the embezzled money by laundering it through different accounts. *See Scallen,* 877 F.2d at 1371; *Furnish,* 262 F.2d at 729. In fact, the IMMC investigators were unable to conclusively determine the exact amount of money misappropriated, due to the difficulty of tracing the cash flow through the Clarks' accounts. *See Scallen,* 877 F.2d at 1371 (an intent to evade taxes is found when taxpayer utilized a scheme making it difficult to trace the cash flow). Moreover, both Robert and Kathleen were intelligent and well-educated individuals, as further demonstrated by their elaborate scheme.

█ Although the Clarks do not dispute that taxes were underpaid due to the failure to report the embezzled income, they assert the Department impermissibly presumed fraud to support the imposition of the penalty by utilizing a presumption that they had knowledge of their obligation under the tax laws to report embezzled income. However, this claim misconstrues the nature of the presumption in this case. A presumption of knowledge of the law does not further serve as a presumption of fraud. Instead, it is part of the totality of the circumstances to support a finding of fraud. To prove fraud, the Department must negate the protesting taxpayers' claims of ignorance. *Cheek,* 498 U.S. at 202, 111 S.Ct. at 610–11, 112 L.Ed.2d at 630 ("This is so because one cannot be aware that the law imposes a duty upon him and yet be ignorant of it, misunderstand the law, or believe that the duty does not exist.").

█ It is a well-established principle that ignorance of the law is no excuse. *Id.* at 199, 111 S.Ct. at 609, 112 L.Ed.2d at 628; *Millwright v. Romer,* 322 N.W.2d 30, 33 (Iowa 1982). We have consistently held that individuals are presumed to know the law. *Millwright,* 322 N.W.2d at 33; *accord Cheek,* 498 U.S. at 199, 111 S.Ct. at 609, 112 L.Ed.2d at 628. Nevertheless, we acknowledge that the tax code can be confusing. *See* 47A C.J.S. *Internal Revenue* § 10, at 54 (recognizing the complexity of the taxation system). Yet, we have charged citizens with knowledge of the law, even when it can be complex and confusing. *Millwright,* 322 N.W.2d at 33 ("We find that plaintiffs, under the vigilance which the law requires of them, should have known that the will violated the rule against perpetuities."). Moreover, embezzled income has been labeled as taxable income under federal law since 1961. *See James v. United States,* 366 U.S. 213, 221, 81 S.Ct. 1052, 1056, 6 L.Ed.2d 246, 254–55 (1961); *see also* 47A C.J.S. *Inter-*

*nal Revenue* § 59, at 190 (taxpayer must report illegally acquired income even though taxpayer is not entitled to retain the money and may have to later reimburse the person whom he or she defrauded). The Internal Revenue Service, as well as state tax authorities, publish numerous materials to guide taxpayers in the preparation of their taxes. *See* 47A C.J.S. *Internal Revenue* § 10, at 55. These factors help support the existence of the presumption of knowledge.

We also reject Kathleen's claim of ignorance of her husband's misappropriations. We agree with the agency's finding that her testimony on this issue was not credible. Kathleen may not have been the "moving spirit" in the embezzlement, but this is irrelevant to the issue of her tax liability. *See Howell v. Comm'r of Internal Revenue*, 175 F.2d 240, 241 (6th Cir. 1949). We find the evidence shows Kathleen played a significant role in the embezzlement scheme. As noted, she aided Robert in concealing the embezzlement by laundering funds through their banking accounts. Even assuming Kathleen did not actually participate in the actual money laundering, the evidence supports a finding she had reason to know of the illegal activity. *See In re Clark*, 106 B.R. 602, 604 (Bankr.E.D.Mo.1989). Kathleen had access to both her and Robert's accounts, and the records of these accounts were available for her inspection. *See id.*

Moreover, Kathleen directly benefited from the embezzled income. *See id.* at 605. She and Robert took numerous trips requiring round-trip air travel during the time periods in question and stayed at luxurious hotels. *See id.* Their home was extensively redecorated and furnished with paintings from art galleries throughout the United States. *See id.* Kathleen personally dealt with the interior decorator and chose many of the paintings. Furthermore, she purchased a significant amount of women's clothing and received expensive jewelry. Considering the reported taxable incomes, a reasonable person in Kathleen's position would be expected to know such a lifestyle was not possible to maintain on the level of income reported on the returns. *See id.* at 604. She was not permitted to close her eyes to the numerous factors indicating her husband was embezzling income from his employer. Under the circumstances of this case, it is not inequitable for the law to hold Kathleen liable for the tax penalties and other assessments for the omitted income. *See id.* at 605. To hold otherwise would "perpetuate the injustice of relieving embezzlers of the duty of paying income taxes on the money they enrich themselves with through theft while honest people pay their taxes on every conceivable type of income." *James*, 366 U.S. at 221, 81 S.Ct. at 1056, 6 L.Ed.2d at 255.

## VI. Inadmissible Evidence.

 Iowa Code section 17A.14(1) and Iowa Administrative Code rule 701—7.17(2)(c)(1) (1999) govern the admissibility of evidence in contested case hearings before the Department. The administrative law judge may base the decision upon evidence that would ordinarily be deemed inadmissible under the rules of evidence, as long as the evidence is not immaterial or irrelevant. *Id.* Consequently, hearsay evidence is admissible and may constitute substantial evidence for the Department's decision. *Gaskey v. Iowa Dep't of Transp.*, 537 N.W.2d 695, 698 (Iowa 1995); *Johnson v. Iowa Employment Sec. Comm'n*, 239 Iowa 816, 828–29, 32 N.W.2d 786, 792 (1948). Notwithstanding, evidence that is not provided to a requesting party during the discovery process is inadmissible, irrespective of its reliability. Iowa Admin. Code r. 701—7.17(2)(c)(1).

 The Clarks contend the agency erroneously admitted two exhibits that

were not provided pursuant to their discovery requests. The first exhibit was a written report by an investigator that detailed the investigation of the embezzlement scheme and compiled the Clarks' expenditures. Although the Department identified the report prior to the hearing, it failed to include five pages of the report. Likewise, the Department failed to identify or provide the Clarks a copy of the exhibit summarizing the activity of the IPIC account. To the extent the Department failed to comply with the discovery rules, we find the noncompliance did not prejudice the Clarks. The investigator testified at the hearing, and the Clarks were able to cross-examine him regarding his conclusions and the preparation of the report. Moreover, another witness provided testimony concerning withdrawals from the IPIC account, and was subjected to examination by the Clarks. Thus, the agency's decision was not based on inadmissible evidence.

### VII. Conclusion.

We conclude married taxpayers cannot amend their tax returns to change their filing status in order to avoid joint liability. Furthermore, we conclude substantial evidence exists to support a finding by the Department of clear and convincing evidence the Clarks willfully filed false tax returns with the intent to evade tax. In addition, we reject the Clarks' contention that the agency based its decision on inadmissible evidence. The district court properly denied the Clarks' petition for judicial review.

**AFFIRMED.**

All justices concur except TERNUS, J., who takes no part.