# IN THE COURT OF APPEALS OF IOWA

No. 17-0213
Filed February 21, 2018

**ANITA BABE,**
        Petitioner-Appellant,

**vs.**

**IOWA BOARD OF EDUCATIONAL EXAMINERS,**
        Respondent-Appellee.
_____

Appeal from the Iowa District Court for Polk County, Scott D. Rosenberg, Judge.

Anita Babe appeals from the judicial-review decision upholding the Iowa Board of Educational Examiners' findings and conclusions. **REVERSED AND REMANDED WITH DIRECTIONS.**

Becky S. Knutson of Davis, Brown, Koehn, Shors & Roberts, P.C., Des Moines, for appellant.

Thomas J. Miller, Iowa Attorney General, and Renner K. Walker and David M. Ranscht, Assistant Attorneys General, Des Moines, for appellee.

Heard by Danilson, C.J., and Vaitheswaran and Bower, JJ.

**DANILSON, Chief Judge.**

The Iowa Board of Educational Examiners (Board) determined Anita Babe committed an act of physical abuse of a student. Babe filed a petition for judicial review and the district court affirmed the ruling. Babe asserts there is not substantial, credible evidence to support the Board's findings. She also asserts the sanction imposed was "unreasonable, arbitrary, capricious or an abuse of discretion," or "so grossly disproportionate to the benefits accruing to the public interest from that action that it must necessarily be deemed to lack any foundation in rational agency policy." Finally, Babe argues the decision was inconsistent with the Board's precedent and prior decisions.

Because there is not substantial evidence to support a finding Babe committed an act of physical abuse, and thus, no basis for the disciplinary sanction imposed, we reverse and remand to the district court with directions that the matter be remanded to the Board for dismissal.

**I. Background Facts and Proceedings.**

Babe has been teaching since 1991 and is currently a teacher in the Des Moines Public School District. Babe taught at Holy Family School, Perkins Elementary School, Capitol View Elementary School, and—for the ten years before the incidents at issue—at Hubbell Elementary School. Babe holds a Master Educator Teaching License, as well as a Professional Administrator License.

At Hubbell, Babe was not only a full-time fifth-grade teacher she was also the dean of students. Babe became Hubbell's dean of students for the 2013-2014 school year. As dean, when the principal, Carrie Belt, was out of the

building, Babe was the one who dealt with student discipline issues. Babe was also a member of Hubbell's Crisis Intervention Team. In order to be a part of this team, Babe received additional training on how to handle difficult students. It is the policy of the district that school personnel "are not allowed to put hands on students unless they are a danger to themselves or others. Even if they're throwing a laptop across the room, we're not allowed to intervene because they're not endangering others or themselves."

D.L. was a fifth-grade student at Hubbell during the 2013-2014 school year. D.L. was born with a heart condition where one chamber of the heart is missing. D.L. underwent extensive surgeries and, as a result of one of the surgeries, suffered brain damage. This damage resulted in D.L. experiencing "a multitude of behavioral issues," such as difficulty reading, performing math, concentrating, remembering, and expressing himself. He is frustrated easily, resulting in his acting out—breaking pencils, swearing, upending chairs, and strolling out of his classroom. D.L. had two teachers assigned to him, Paula Beaumont and a special-education teacher, Jo Yochum.

On Thursday, April 10, 2014, Principal Belt was not present at Hubbell, and thus, Babe was in charge as the dean of students. That morning, D.L. was misbehaving in Yochum's classroom and left the room without permission. Babe was called to deal with the situation. She found D.L. in the hallway near the elevator on the second floor of the building. At that time D.L. told Babe he had permission to be out in the hallway. He did not. Babe and D.L. got on the elevator and went to the third floor. Upon exiting the elevator, D.L. started up a

ramp that leads to the bookroom, telling Babe he wanted to stay up there. Babe followed D.L. up the ramp and stated he could not stay there and needed to go.

Richard Maruca, from his classroom some ninety feet away, heard arguing between Babe and D.L. with their voices escalating. When the voices got louder, Maruca looked outside of his classroom door to check on the two and looked up the ramp. Maruca saw Babe and D.L. Babe's back was to Maruca and D.L. was on the other side of Babe, facing her. Maruca saw Babe raise both her arms and move forward. However, Maruca was not in a position to see any contact.

Maruca, feeling the situation was escalating, did not intercede but went to the office to find the principal. When he arrived at the principal's office, he learned Belt was not in. The office manager, Sherrie Sauls, noted Maruca was pacing and nervous, and she asked him what the problem was. In response, Maruca stated, "They're at it again." Sauls inquired who "they" were and mouthed "Anita [Babe] and [D.L.]?" Maruca answered in the affirmative, took no further action and returned to his classroom.

Yochum eventually accompanied D.L. to the office and Babe joined them. D.L.'s mother was called and she came to the school to pick up D.L. During this time D.L. made no comment about being grabbed or hurt.[1] D.L. then left with his mother. On the ride home, D.L. told his mother Babe had hurt him and squeezed his arm and she was mean to him. His mother looked at D.L.'s arm and saw no injury. When they got home, D.L. again mentioned his arm hurt and his mother again looked at his arm and saw no injury to his right arm.

---

[1] D.L. was known to make statements about not feeling well so he could go the nurse's office.

On Friday, April 11, D.L. again said his arm hurt and his mother again did not see anything on the front of his arm. The mother stated D.L. stayed home on April 11 and did not go to school. However, Babe testified D.L. attended school on April 11, and D.L., his mother, and Babe met to discuss a modified behavior contract. Yochum, too, testified there was a meeting with D.L. and his mother on April 11. No mention was made to Babe or Yochum of D.L.'s arm or any injury.

On Saturday, D.L. again told his mother his arm hurt. When D.L.'s mother looked at the back of D.L.'s right arm she observed bruises that she believed to have lines like fingers. She also saw black marks she believed to be a thumbprint and fingerprints. She asked D.L. what had happened. D.L. told her Babe had squeezed him and hurt him. The mother said she was going to inform the school but D.L. begged her not to tell the principal because he was afraid Babe would be mean to him. On that same weekend, D.L. was wrestling with his cousin and his cousin hit him. This resulted in a bruise up near the armpit of D.L.'s right arm.

On Monday, April 14, D.L. returned to school. Nothing of note occurred that day.

During the morning of April 15, D.L. was working in Yochum's special education room with Payton Ball, a Drake University practicum student. D.L. became frustrated while working with math manipulation cubes and swept the cubes off the table. He flipped his chair over, flipped other chairs over in the room, and left the room and sat on a bench in the hallway. Yochum called Babe for assistance because Principal Belt was out of the building. Babe spoke with D.L. and the two went to the principal's office, where Babe called D.L.'s mother.

At about 2:30 p.m. on Tuesday, April 15, D.L.'s mother telephoned to speak to Babe, but she was told Babe was in class and not available. She then asked to speak to Principal Belt (now back in the building) and informed her about the bruising to D.L.'s arm. Principal Belt instructed the mother to come to the school and file a complaint. The mother did go to the school and filed a formal complaint. D.L. was brought to the principal's office. Principal Belt said to D.L. your mother said Babe grabbed your arm. At that time, D.L. also had bruising slightly above his wrists from where he said Babe had "pulled him into a chair."

D.L. was then escorted to the nurse's office and was seen by the school nurse, Michelle Beebe. Nurse Beebe observed bruising on D.L.'s upper right arm, back by the armpits. She also observed bruising on the lower forearms. The bruising on the back of the upper right arm was described by Nurse Beebe as a long bruise, bluish-purple in color with some yellowish-green color around it, which was approximately a quarter to a half inch by four inches in size. D.L. attributed this bruising to "that girl" and after Nurse Beebe provided several names, D.L. agreed it was Babe.[2] Other bruises were also visible on D.L.'s arm. These included a small bruise near his armpit, which was bluish-purple in color and to which D.L. attributed to wrestling with his cousin. D.L. also had bruising around his forearms that were "bluish-purple." D.L. told Nurse Beebe the bruises on the lower forearms were caused by Babe grabbing him that morning, April 15.

---

[2] Nurse Beebe explained bruises "start out like a blue or a purple color" and "[a]s the blood starts to break down, they turn greenish-yellowish." She did not opine the length of time necessary for a bruise to begin to change color.

On that same date, April 15, 2014, Babe was told by Principal Belt she was administratively suspended from her position for making physical contact with D.L. on April 10 and April 15 and leaving bruise marks on his arm.[3]

On April 16, Principal Belt called Babe and explained there had been a complaint of an injury from D.L.'s parent and that D.L. had bruising on his arm. Principal Belt asked Babe, "Have you ever touched him?" Babe responded, "Not in a yanking way." Principal Belt described the conversation further,

> She [Babe] said she was in the hallway with him, and Jo [Yochum] was there most of the time.
> I asked her, "Last Thursday in the book room did you grab him by the arms?"
> And she said she did not grab him. They went to the book room to look for Jo.
> And then I asked her, "If yesterday in Room 201, did you grab him by the arms and pull him out of a chair?" And she said no.
> . . . .
> Q. Okay. And when—I guess so is this at least an attempt at a verbatim transcription? A. Yes.
> . . . .
> Q. . . . So did you mention yanking at all to her? A. No.
> Q. You said, "You have never touched him?" A. Yes.
> Q. And she said? A. "Not in a yanking way."

On July 3, 2014, a complaint was filed by the school district to the Board. Babe denied the allegations she touched or made physical contract with D.L. The Board ordered an investigation of the alleged incidents (a "level-two"

---

[3] The principal was required to perform a "level-one" investigation, which really does not involve an investigation but rather is more akin to taking information from the complainant (D.L.'s mother) to determine whether the complaint, if true, would constitute physical abuse. *See* Iowa Code § 280.17; *see also* Iowa Admin. Code r. 281–102.8 (stating in subrule 5 that "[t]he designated investigator's role is not to determine the guilt or innocence of the school employee, the applicability of the exceptions or reasonableness of the contact or force listed in rule 281–102.4 . . . [but to] determine, by a preponderance of the evidence, whether it is likely an incident took place between the student and the school employee").

investigation).[4] On November 4, 2014, after the investigation was concluded, the Board sent a notice of hearing, alleging that on one occasion Babe grasped D.L.'s arm leaving a bruise, and on another occasion Babe had grabbed D.L.

On April 6 and 7, 2015, a hearing was held before an administrative law judge (ALJ). Principal Belt, Maruca, Sauls, D.L.'s mother, and Nurse Beebe all testified, as did Babe.

A Hubbell teacher, Peggy Lemke, was called as a witness by Babe. Lemke testified D.L. frequently bullied other students at Hubbell. Lemke testified D.L. was not truthful with her almost on a "daily basis."

Retired teacher and now substitute teacher and former dean of students, Shirley Brunk, testified that at times D.L. was not truthful and would deny doing acts or state "it didn't happen" or that a teacher was just making it up.

Laurie Kreamer, a special-education teacher at Hubbell, testified she was acquainted with both Babe and D.L. She state D.L. was "challenging, both academically and behaviorally." She described D.L. as belligerent at times; he would refuse to do things, get up and leave the classroom, say unkind things to other students, and refuse to do any work. Kreamer testified D.L. swore, used "cuss" words, threatened other students, and committed acts like taking pencils or erasers from other students and then stating he did not have them. Kreamer further testified D.L. in April or May 2014 threatened a school aid—D.L. came up

---

[4] Iowa Administrative Code rule 281–102.8(5) provides:

> The level-two investigator appointed, contracted, requested or retained under subrule 102.5(2), when called upon for further investigation, shall consider the applicability of the exceptions listed in rule 281–102.4 and the reasonableness of the contact or force used under subrule 102.4(2) in reaching conclusions as to the occurrence of physical abuse as defined by these rules.

behind the school aid, took the school aid's arm and wrapped it around his own neck, and stated he would tell somebody she was trying to strangle him.

Drake University student practicum teacher Ball testified D.L. was a "very difficult student that gets frustrated very easily." Ball stated she never observed Babe touch D.L. at any time.

Julie Carpenter, an associate at Hubbell in 2014, testified she would interact with D.L. during breaks in the day to help D.L. readjust and calm down due to his mental disabilities. Carpenter stated D.L. would sometimes break pencils or refuse to do things and follow directions. She also stated D.L. was not always truthful with her. Carpenter was present when Nurse Beebe examined D.L. on April 15. She recounted that the nurse asked D.L. how he got the bruises on his arm. At one point D.L. stated he received a bruise on his arm from "that girl." Nurse Beebe then started to recite names to D.L. to find out who "that girl" was. When Nurse Beebe suggested or stated Babe's name, D.L. stated she was the one who caused the bruises. Carpenter testified she had a later interaction with D.L. during which D.L. stated he could get her fired.

Yochum testified D.L. was below grade level academically in all subjects. Yochum also testified D.L. had behavioral issues, which manifested in "multiple ways," such as "[w]ork refusal, work avoidance, authoritative figures." Yochum stated D.L. targeted one student frequently and was "not nice" to that particular student. D.L. would verbally threaten other students, use physical intimidation, and flip chairs over. Besides this aggressive behavior, D.L. also was not always truthful with Yochum.

Yochum was present on April 10. She stated she observed D.L. and Babe on the ramp. Yochum could hear D.L. "yelling" and could also hear Babe talking and yelling. It appeared to Yochum that Babe had things under control and Yochum did not go to where D.L. and Babe were in order to avoid escalating the situation. Yochum testified there was no occasion in which D.L. complained to her about bruises or pain after the encounter.

Kimberly Glynn, the music teacher at Hubbell, was in her classroom on April 10. Glynn testified that from her classroom she could hear disturbances or yelling on the ramp on which the incident between Babe and D.L. occurred. Glynn testified she heard no yelling or any argument on the morning of April 10.

Fifth-grade Hubbell teacher Beaumont testified she had twenty-two-years' teaching experience and was acquainted with both Babe and D.L. Beaumont described D.L. as "a bit oppositional," "could be quite friendly," "defiant," and "academically working at maybe a kindergarten, first-grade level." Beaumont had the opportunity to observe D.L. on April 10 and April 15 because D.L. was in her classroom for parts of the day. She stated D.L. made no complaints about pain or bruises to her and also did not complain about Babe.

Cathy Collins-Reilly, the level-two investigator in this matter, talked to D.L., who she stated had been "prepped" by attorneys before the interview. She testified D.L. did his best to recall the events of April 10 and April 15, 2014, but

> when he did, in both instances he literally jumped over the part about being touched, so I had to go back and try to get him to focus on—and I hate asking leading question like that, but I think under the circumstances, given his intellectual capacity and probably the over preparation process that I suspect he went through, we eventually did get to [the topic].

D.L. stated Babe "grabbed" and "hurt me." Collins-Reilly noted Babe denied touching D.L. at all. She concluded Babe had grabbed D.L. without justification[5] and caused bruising. Collins-Reilly acknowledged that no one asked a doctor if D.L. would bruise more easily because he was taking a baby aspirin on a daily basis. She admitted if D.L. bruised more easily because of the aspirin, it could have changed her mind in the disposition of her investigation.

On May 22, the ALJ issued a proposed decision finding Babe caused injury to D.L.'s arm on April 10, 2014, but did not touch or make physical contact with D.L. as alleged on April 15. The ALJ rejected the State's request for a three-year suspension of Babe's license, finding:

> Thi*s* was an isolated incident in an otherwise spotless teaching career. The undersigned believes that [Babe] is an excellent and effective teacher who is loved by students, parents, and co-workers alike. She just made a mistake in this incident; a mistake that resulted in an injury to a student. The facts and circumstances of the violation justify a period of suspension but for one year, not three.

The ALJ determined Babe's "Master Educator License and Professional Administrator License [are] hereby SUSPENDED for a period of twelve months. [Babe] is given credit for the [twelve] months that she has been administratively suspended from her teaching and administrative obligations."

On October 9, 2015, without hearing or argument, the Board adopted the proposed decision but modified the suspension, ordering:

> [Babe] shall be SUSPENDED for twelve months, with credit given for the [twelve] months of administrative suspension imposed by the school district. [Babe] shall complete a [fifteen]-hour Ethics for Educators course, and an anger management course, which shall

---

[5] Education rules allow physical contact under certain enumerated circumstances. *See* Iowa Admin. Code r. 281–102.4(1).

be pre-approved by the Board. [Babe] shall be SUSPENDED for an additional [twelve] months, which shall be deferred upon receipt of documentation indicating completion of the required ethics and anger management courses.

On October 29, 2015, Babe filed a petition for judicial review of agency action. After receiving briefs and hearing arguments, the district court upheld the Board's ruling. Babe now appeals.

## II. Scope and Standard of Review.

"Appellate review of the contested case proceeding of a licensing board is for correction of errors at law." *Christiansen v. Iowa Bd. of Educ. Exam'rs*, 831 N.W.2d 179, 186 (Iowa 2013). We review the district court decision applying the standards of Iowa Code section 17A.19 (2015). *Id.* "We review an agency's factual findings for substantial evidence based on the record viewed as a whole." *Id.* (citations omitted).

> When dealing with the issue of whether substantial evidence supports the agency's findings, the district court and the appellate court can only grant relief to a party from the agency's decision if a determination of fact by the agency "is not supported by substantial evidence in the record before the court when that record is viewed as a whole." Iowa Code § 17A.19(10)(f).

*Gits Mfg. Co. v. Frank*, 855 N.W.2d 195, 197 (Iowa 2014).

## III. Discussion.

*Sufficiency of the evidence.* Babe maintains the district court erred in upholding the Board's finding that she physically abused a student.

### A. Statutory and regulatory overview.

Iowa Code section 272.2 creates the board of educational examiners and gives the board "exclusive authority" to license teachers; enforce the board's rules through revocation or suspension of a license, or by other disciplinary action; establish

and adopt rules; deny or revoke a license; and manage other responsibilities enumerated in section 272.2.

*Stotts v. Eveleth*, 688 N.W.2d 803, 808 (Iowa 2004); *see* Iowa Code § 272.2(4) (stating the board of educational examiners is created to "[e]nforce rules adopted by the board through revocation or suspension of a license, or by other disciplinary action against a practitioner or professional development program licensed by the board of educational examiners").

Chapters 1 through 27 of Title 282 of the Iowa Administrative Code contain the Board's administrative rules. Chapter 11 of Title 282 governs complaints and contested case hearings conducted by the Board. *See* Iowa Admin. Code r. 282–11.1 ("This chapter applies to contested case proceedings conducted by the board of educational examiners."). And chapter 25 sets out the code of professional conduct for educators. "This code of professional conduct and ethics constitutes mandatory minimum standards of practice for all licensed practitioners as defined in Iowa Code chapter 272. The adherence to certain professional and ethical standards is essential to maintaining the integrity of the education profession." *Id.* r. 282–25.1.

"Licensees shall maintain professional relationships with all students, both inside and outside the classroom. The following acts or behavior constitutes unethical conduct without regard to the existence of a criminal charge or conviction: Committing *any act of physical abuse* of a student." *Id.* r. 282–25.3(1)(e)(1) (emphasis added). The Board's rules further provide that violation of the code of conduct constitutes "unprofessional and unethical conduct justifying disciplinary sanction." *Id.* r. 282–26.1.

*B. Physical abuse.* Here, the Board sanctioned Babe for an act of physical abuse of a student. The rules of the board of educational examiners, however, do not define "physical abuse of a student." We find some guidance when reviewing educators' responsibilities as set out in Iowa Administrative Code rule 282–26.3. Under that rule, licensed educators have the following responsibilities: "to provide conditions that are conducive to teaching and student learning"; to "protect students from conditions harmful to learning or to health or safety"; and educators "shall not, without just cause, restrain a student from independent action in the pursuit of learning." *Id.* r. 282–26.3(3), (4), (5). Moreover, we note that an "educator who has reasonable basis to believe that a student has been abused, *as defined by law*, shall make all reports required by law and the Iowa Administrative Code and which are necessary to ensure the safety and well-being of the student." *Id.* r. 282–26.3(10) (emphasis added).

"Physical abuse" of a child is defined in Iowa Code section 232.2(42) as "mean[ing] any nonaccidental physical injury suffered by a child as the result of the acts" of another person. The state board of education, which is "the governing and policy-forming body for the department of education,"[6] similarly defines "physical abuse" as the "nonaccidental physical injury to the student as a result of the actions of a school employee."[7] *Id.* r. 281–102.2(1). Rule 281–

---

[6] Iowa Admin. Code r. 281–1.1.

[7] Rule 281–102.2(2) defines a "school employee" as "a person who works for pay . . . under the direction and control of . . . any administrator of a public school district." The rule also states "[s]chool employees are of two classes: certificated (licensed) and noncertificated (unlicensed). A certificated employee holds an Iowa teacher's certificate issued by the department of education or a license issued by the state board of educational examiners." *Iowa Admin. Code* r. 281–102.2(2).

There is a "safe harbor." *See Christiansen*, 831 N.W.2d at 194. Rule 281–102.4(1) provides:

102.2(2) provides: "'Injury' occurs when evidence of it is still apparent at least [twenty-four] hours after the occurrence."

*C. Analysis.* Babe argues there is no evidence she caused any deliberate injury to the student. Babe notes there were no eyewitnesses of any alleged grabbing. She maintains D.L.'s statements should not be given any credence because D.L. did not testify; his statements were inconsistent; and he is known to lie to his mother, teachers, and school administrators. Babe also argues there were no marks seen on D.L. until several days after the date on which the physical contact was alleged to have occurred.

The Board asserts the findings are supported by Maruca's observations of Babe's and D.L.'s positioning and his testimony of their yelling at each other; Beebe's observations of the color and shape of bruises on D.L.'s arms; Yochum's observations of Babe and D.L. arguing and yelling; the observations

---

The following do not constitute physical abuse, and no school employee is prohibited from:

(a) Using reasonable and necessary force, not designed or intended to cause pain:

(1) To quell a disturbance or prevent an act that threatens physical harm to any person.

(2) To obtain possession of a weapon or other dangerous object within a pupil's control.

(3) For the purposes of self-defense or defense of others as provided for in Iowa Code section 704.3.

(4) For the protection of property as provided for in Iowa Code section 704.4 or 704.5.

(5) To remove a disruptive pupil from class, or any area of school premises or from school-sponsored activities off school premises.

(6) To prevent a student from the self-infliction of harm.

(7) To protect the safety of others.

(b) Using incidental, minor, or reasonable physical contact to maintain order and control.

D.L.'s mother made of the finger-shaped bruising; and D.L.'s statements,[8] which are corroborated by the others' observations all provide substantial evidence to support the Board's findings.

As noted in *Christiansen*, "Our review of the district court's decision to affirm the Board on the merits is 'controlled in large part by the deference we afford to decisions of administrative agencies.'" 831 N.W.2d at 191 (quoting *Cedar Rapids Cmty. Sch. Dist. v. Pease*, 807 N.W.2d 839, 844 (Iowa 2011)). It is the agency's duty "as the trier of fact to determine the credibility of the witnesses, weigh the evidence, and decide the facts in issue." *Arndt v. City of Le Claire*, 728 N.W.2d 389, 394–95 (Iowa 2007). "We are bound by the agency's findings so long as they are supported by substantial evidence." *Am. Eyecare v. Dep't of Human Servs.*, 770 N.W.2d 832, 835 (Iowa 2009). "[E]vidence may be substantial even though we may have drawn a different conclusion as fact finder." *Pease*, 807 N.W.2d at 845. Because some of Babe's points of error pertain to the agency's findings of fact, our review is for substantial evidence.

Thus, we review to determine whether the evidence in this case "would be deemed sufficient by a neutral, detached, and reasonable person, to establish the fact at issue when the consequences resulting from the establishment of that fact are understood to be serious and of great importance." Iowa Code § 17A.19(10)(f)(1). "In our fairly intensive review, we view the record as a whole, which includes a consideration of evidence supporting the challenged finding as

---

[8] Babe acknowledges "hearsay evidence is admissible at administrative hearings." *McConnell v. Iowa Dep't of Job Serv.*, 327 N.W.2d 234, 237 (Iowa 1982); *accord Clark v. Iowa Dep't of Revenue & Fin.*, 644 N.W.2d 310, 320 (Iowa 2002).

well as evidence detracting from it." *Neal v. Annett Holdings, Inc.*, 814 N.W.2d 512, 525 (Iowa 2012).

> Our review of "the record as a whole" is defined by our legislature as:

> [T]he adequacy of the evidence in the record before the court to support a particular finding of fact must be judged in light of all the relevant evidence in the record cited by any party that detracts from that finding as well as all of the relevant evidence in the record cited by any party that supports it, including any determinations of veracity by the presiding officer who personally observed the demeanor of the witnesses and the agency's explanation of why the relevant evidence in the record supports its material findings of fact.

Iowa Code § 17A.19(10)(f)(3); *Christiansen*, 831 N.W.2d at 192 ("In a substantial-evidence challenge to agency fact-findings, the court must consider 'any determinations of veracity by the presiding officer who personally observed the demeanor of the witnesses.'"). Here, neither the ALJ nor the Board personally observed D.L. testify, and any credibility determination in his favor suffers from the absence of any demeanor evidence.

The fact that there are only two people, D.L. and Babe, who know the truth is both troubling and difficult, particularly because D.L. did not testify. The district court acknowledged hearsay was heavily relied upon in this case and the evidence was "filled with hearsay statements from D.L." Of course, hearsay evidence is admissible in administrative proceedings and, if not controverted, can alone constitute substantial evidence. *Schmitz v. Iowa Dep't of Human Servs.*, 461 N.W.2d 603, 607 (Iowa Ct. App. 1990).[9] *But see* Iowa Code § 17A.14(1) ("A

---

[9] The *Schmitz* court stated:

> If the record is composed solely of hearsay evidence, we must examine the evidence closely in light of the entire record. Again, we believe we must evaluate the quantity and quality of the evidence, to

finding shall be based upon the kind of evidence on which reasonably prudent persons are accustomed to rely for the conduct of their serious affairs, and may be based upon such evidence even if it would be inadmissible in a jury trial."); *Gaskey v. Iowa Dep't of Transp.*, 537 N.W.2d 695, 698 (Iowa 1995) (finding an officer's certified implied consent form standing alone—even though it was hearsay—was substantial evidence, but noting the failure to consider the consent form as substantial evidence "would effectively allow a licensee, with the burden of proof, to prevail without offering any evidence at the hearing"). As was found in *Robinson v. Iowa Department of Human Services*, No. 09-0985, 2010 WL 2383190, at *7 (Iowa Ct. App. June 16, 2010), the "fundamental dilemma in this case is that the hearsay essentially comes through the filter" of a parent—D.L.'s mother. She testified as to what she recalls D.L. stated to her, but she cannot be described as a disinterested witness. *See Schmitz*, 461 N.W.2d at 608 (noting statements by a father seeking custody of couple's child "must be highly suspect").

What we do know is that D.L. does not always tell the truth. Seemingly everyone who has had any contact with D.L. knows he lies, including his mother. One of his lies was that the bruises on his forearms were caused by Babe on April 15. This statement was clearly in error as D.L.'s forearms already had

---

> see whether it rises to necessary levels of trustworthiness, credibility, and accuracy required by a reasonably prudent person in the conduct of serious affairs. In making this evaluation, we will conduct a common sense evaluation of (1) the nature of the hearsay; (2) the availability of better evidence; (3) the cost of acquiring better information; (4) the need for precision; and (5) the administrative policy to be fulfilled. None of these criteria, however, should be dispositive, and in each case these criteria must be given appropriate weight.

461 N.W.2d at 607-08 (internal citations omitted).

bruises on April 15. In fact, Investigator Collins-Reilly and the agency both concluded there was no corroborative evidence for this statement. Yet, the Board contends we should accept as the truth D.L.'s hearsay statement for the incident that occurred on April 10.

As we examine how the ball got rolling in this case, we note that Principal Belt essentially accepted D.L.'s mother's statement at face value. She did not ask D.L. what happened but rather stated your mother says you were grabbed by Babe. She did examine D.L.'s bruises but she only had to determine—if the statement was true—"whether it is likely an incident took place between the student and the school employee." *See* Iowa Admin. Code r. 281–102.8(5).

Investigator Collins-Reilly acknowledged that initially D.L. didn't even mention any physical contact when she asked what happened. This significant omission happened notwithstanding spending time with attorneys trying to prepare and coach D.L. for the interview. After first being confused by D.L.'s responses to her questions, she was required to make D.L. "focus." Then, only through the use of leading questions, was she able to elicit and construe D.L.'s allegation that Babe had grabbed him on April 10. Unfortunately, our record does not include the video of the interview, so we are unable to review it.

Hubbell associate Carpenter, a former certified nursing assistant and employee of ChildServe, was asked to escort D.L. to the nurse's office so Nurse Beebe could examine D.L. According to Carpenter, Nurse Beebe also inquired of D.L. who caused the bruises, but he was unable to identify anyone other than "that girl." Again, only when Nurse Beebe led D.L. by providing several names,

did he pick Babe's name.[10]  We acknowledge, however, that in light of D.L.'s intellectual impairment the use of leading questions appears to have been the only manner to elicit any relevant information, whether true or false.  Our concern is with the use of improperly suggestive leading questions, the susceptibility of the person being asked, and whether the person simply parrots what the questioner asks or responds because that is what the person believes the questioner wants to hear.  Unfortunately, how suggestive the questions may have been to D.L. cannot be determined from this record in the absence of the ALJ's ability to view the demeanor of D.L. as a witness.

The Board was required to prove Babe caused a physical injury to D.L.  Although the school policy prohibited any touching, the Board alleged Babe did an act causing physical injury to D.L.  Here, there is no dispute D.L. had multiple bruises on April 15.  D.L.'s mother told Principal Belt and testified that in her opinion, the bruises were indicative of fingers grabbing D.L.  The mother explained she saw at least four bruises.

Nurse Beebe examined the bruises on April 15.  She explained, "He had a bruise on his upper right arm, he had some bruising on his back by his armpit, and then he had bruises on both lower forearms."  The bruise on his upper right arm was about "a quarter inch—half inch by four inches" long and was an older bruise as it was bluish-purple with some greenish-yellow color.  All other bruises were bluish purple.  In her opinion, the bruises did not occur at the same time.  Nurse Beebe accepted D.L.'s statements about the cause for the bruises and did

---

[10] Nurse Beebe's recollection of her conversation with D.L. controverts Carpenter's recollection.  But Carpenter had no difficulty recalling the conversation and could recite the conversation with much detail.

no independent investigation of the cause or causes. She expressed no personal opinion on the cause of the bruises, if they could have been caused by someone grabbing D.L., or the possible date of any incident that may have caused the bruises except to say some bruises were several days old.

The ALJ stated, "[T]he bruises described by Ms. Beebe match up perfectly with an adult's hand grabbing Student A."[11] However, earlier in the ALJ's proposed decision the ALJ stated,

> State's Exhibit 8, page 21, is a photograph of a raised arm with a face turned away. This photograph purportedly shows the bruising Ms. Beebe described. The photograph is completely without any evidentiary value because it is a photocopy of a color photograph. As such it is black and grey and there is no way to discern where the bruises are.

We agree with the ALJ's opinion as to the evidentiary value of the photograph. We are at a loss, however, how the ALJ could later conclude the bruises match up perfectly with an adult hand. Nurse Beebe never opined the bruises matched up with a hand or fingers. Moreover, D.L.'s mother never had D.L. examined by a physician or any medical expert who may have tendered such an opinion. The mother also did not call D.L.'s physician to determine if his heart surgery eight days earlier could have been a cause for the bruising. The only witness who drew the conclusion the bruise was caused by a hand or fingers was D.L.'s mother. Yet, the claim the bruises were caused by a hand or fingers seems to have taken on a life of its own—growing to the point no one disputed it as fact.

We are unwilling to take such a leap of faith. Many bruises are simply normal incidents of childhood.[12] Children suffer bruises, scrapes, and sometimes

---

[11] The ALJ referred to D.L. as "Student A" throughout the proposed decision.

more serious injuries in their homes, while playing, or while participating in acceptable sporting events. Sometimes a child's bruises arise from the child's own carelessness, or from playmates, caretakers, parents, or medical procedures. Most every parent has had a child suffer a bruise from an unknown cause. Accordingly, the existence of a bruise is not evidence of a physical injury per se. *Hildreth v. Iowa Dep't of Human Servs.*, 550 N.W.2d 157, 160 (Iowa 1996). Our caselaw includes numerous cases involving efforts made to retrace where the child may have been, or who the child's caretaker might have been, at the time of an injury to identify a cause or abuser.[13] Again, absent from our record is any evidence that would eliminate medical procedures, caretakers, playmates, or other possible causes of D.L.'s bruises.

We consider the testimony of D.L.'s mother that the child was at school on April 10, and D.L. first complained of a sore or hurt arm on that day after she picked him from school. Perhaps other caretakers or playmates at home could be eliminated as possible abusers because of when the injury or pain first surfaced. But D.L. made no complaints about his arm to anyone at the school while they waited for D.L.'s mother to arrive.

D.L.'s mother noted D.L. was crying and shaking when she arrived and she had never seen him upset like that before, a fact that might support his

---

[12] *See In re B.B.*, 598 N.W.2d 312, 317 (Iowa Ct. App. 1999) (Sackett, C.J. specially concurring) ("It would be hoped a child would never suffer even a bruise or a scrape. Yet, even children in homes where parents never yield a stick or a hand suffer bruises and scrapes and sometimes more serious injuries. The injuries come from play and acceptable sporting events, such as football, boxing, and soccer where physical contact with another that produces pain is a part of the sport itself.").

[13] *See, e.g., State v. Watkins*, 659 N.W.2d 526, 537 (Iowa 2003) (holding, in a child-endangerment case, that evidence was sufficient to establish the defendant caused an injury when State proved the nonaccidental injuries were inflicted while the child/victim was in the exclusive care of the defendant).

injury. However, the office manager Sauls testified D.L. was mad, agitated, and verbal when he met his mother in the office and was not crying. Sauls said D.L. was in the office frequently for behavior issues and often he would ask to go to the nurse's office complaining of a headache or stomachache.[14] But when D.L. was in the office on April 10, he did not ask to go to the nurse's office for pain or for any reason. Babe also noted D.L.'s mother was very angry when she arrived because she had to miss work. D.L. threw his sunglasses on the floor and stomped on them, to which his mother told him, "You are not getting a new pair." No one heard D.L. complain about his arm, or any pain, or ask to go to the nurse's office on April 10, 11, 14, or 15—except D.L.'s mother.

Investigator Collins-Reilly and the ALJ found it significant D.L. told his mother and Nurse Beebe that one of the bruises was from his cousin when he was wrestling with the cousin over the weekend. Each believed D.L. would have blamed all the bruises on Babe if the claim that Babe was responsible for some bruising was false. Possibly this could be true, but we are still faced with no expert testimony that some of the bruises had the appearance of a hand or fingers or that the bruises were caused by some other caretaker, another playmate, or by his recent surgery.

We acknowledge Babe was in a verbal struggle with D.L. on April 10 where both had raised voices and even yelled. One teacher had already lost control of D.L. as D.L. had walked out of his assigned classroom without permission. D.L. lied to Babe about his permission to be in the hallway. Babe

---

[14] In fact, testimony reflected that D.L. was taken to the principal's office two to three times a day for his disruptive behavior.

tried to escort him to the office. He walked away from Babe and up a ramp crowded with boxes and eventually went toward the bookroom. At all times, he was defiant and refused to go to the office with Babe. Babe had her arms raised, perhaps in animation and she acknowledged she raised her arm to point D.L. where to go. She had an opportunity to grab D.L. out of vision of other witnesses. She may have touched a student in the past and threatened to touch another student. She was asked by Principal Belt if she touched Babe and responded, "[n]ot in a yanking way." Babe's past history with D.L. apparently involved other encounters where voices were raised. But she also sat with D.L. in the office many times in an encouraging voice trying to gain his cooperation and calm him down. D.L. has lied many times according to nearly every witness. He clearly lied or was mistaken that Babe grabbed him on April 15.

Moreover, D.L.'s mother was angry with D.L. when she arrived to pick him on April 10 because she had to leave work. D.L. had a recent surgery and a recent bruise from wrestling. No evidence exists in this record to exclude D.L.'s recent surgery, other caretakers, or other activities as a cause for his bruises. D.L. never told any other teacher he was in pain. D.L.'s mother said D.L. told her of the alleged grabbing and his pain on April 10, but she did not report it to the school until April 15, even though she was at the school on April 11. Nobody but D.L.'s mother claimed any bruise looked like a hand or fingers.

The Board had the duty to prove by a preponderance of the evidence Babe caused a physical injury to D.L. We acknowledge the difficulties the Board faced in prosecuting this case in light of D.L.'s impairment and the lack of any eyewitnesses of any contact. Notwithstanding, the Board presented its case

without the testimony of the student, D.L.; without the video of Investigator Collin-Reilly's interview with D.L.; without the benefit of expert testimony regarding D.L.'s bruises; without Investigator Collins-Reilly looking into and eliminating other causes for the bruises; and without color photographs of the bruises. This is a stretch.

Moreover, we know of no reason why D.L. did not testify or why the video of his interview was not presented as evidence. Although there would have been a cost for an expert to testify regarding the bruises, no additional cost would have been incurred to procure D.L.'s testimony. The case was presented through his hearsay statements, in the absence of the ability of the fact-finder to assess his demeanor, and in the absence of consideration of other causes. The hearsay was presented through the filter of a parent and an investigation that was founded upon unknown leading questions. Before discipline is imposed on a teacher, surely we can expect evidence that rises to the level of being trustworthy, credible, and accurate. *Schmitz*, 461 N.W.2d at 608. We may have suspicions of touching or contact while Babe and D.L. interacted, but the sum total of the evidence fails to establish substantial evidence that Babe caused a physical injury to D.L.

In light of our conclusion there is not substantial evidence to support the finding of physical abuse by Babe, there is no basis for the sanction applied. Accordingly, we remand to the district court with instructions that the matter be remanded to the Board for dismissal of the action.

**REVERSED AND REMANDED WITH DIRECTIONS.**